HAWAII LONGLINE ASSOCIATION,
Plaintiff,

v.

NATIONAL MARINE FISHERIES
SERVICE, and Donald L. EVANS, In
his official capacity as Secretary,
United States Department of Com-
merce Defendants.

No. CIV. 01–0765(CKK).

United States District Court,
District of Columbia.

Aug. 31, 2003.

Per A. Ramfjord, Portland, OR, Robert
A. Nelson, Washington, DC, and Jeffrey

W. Leppo, Seattle, WA, Stoel & Rives, L.L.P., for Plaintiff.

Lyn Jacobs and Adam D. Issenberg, U.S. Department of Justice, Environmental Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This is the second time that the Court has been presented with cross-motions for summary judgment during the unusual procedural history of this APA litigation. Plaintiff Hawaii Longline Association's ("HLA's")[1] Second Amended Complaint seeks to set aside regulations and a biological opinion issued by Defendants National Marine Fisheries Service ("NMFS") and Secretary Donald L. Evans affecting the Fishery Management Plan for the Western Pacific Region. Specifically, HLA has moved for summary judgment regarding its second claim for relief, which challenges a rule promulgated on June 12, 2002, 67 Fed.Reg. 40,232 (June 12, 2002) ("June 2002 Regulations"). It has also requested judgment in its favor regarding its third claim for relief, which contests a Biological Opinion issued on November 15, 2002 ("2002 BiOp"). After due consideration of the parties' motions, their oppositions, and their replies, the Court shall grant Plaintiff's Motion for Summary Judgment regarding its second and third claims for relief and deny Defendants' Cross–Motions. With no material facts in dispute, the Court has determined that the June 2002 Regulations and the 2002 BiOp are arbitrary, capricious, and contrary to law

and, therefore, shall be vacated and remanded to NMFS as a matter of law.

## I. BACKGROUND

The issues in this case arise at the cross section of two discrete federal statutes, the Magnuson–Stevens Act, 16 U.S.C. § 1801 *et seq.,* and the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* Therefore, it is necessary to briefly consider the authority NMFS derives from each statute before reviewing the events leading up to the present motions before the Court. After reviewing the statutory framework under which NMFS operates, the Court will then sketch out the events that have transpired in this complicated administrative law case.

### (A) Statutory Framework

### (1) *The Magnuson–Stevens Fishery Conservation and Management Act*

Fisheries under the jurisdiction of the United States are regulated by the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. § 1801 *et seq.* Among its various provisions, the Magnuson–Stevens Act established eight regional councils comprised of "individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned." 16 U.S.C. § 1852(a)(2)(A). In order to ensure a balanced cross-section of interested parties on each council, the Act requires the Secretary of Commerce[2]—and, ultimately

1. HLA is a trade association that represents the Hawaii-based longline tuna and swordfish fishing industries.

2. The Secretary of Commerce administers the Magnuson–Stevens Act through the National

Oceanic and Atmospheric Administration ("NOAA"), which in turn has delegated this responsibility to NMFS. *See* 50 C.F.R. § 600.10 *et seq.*

NMFS—to abide by certain appointment and reporting requirements. 16 U.S.C. § 1852(a)(2)(B). Each council is vested with the authority to issue regulations for the conservation and management of the fisheries in its geographic region, including comprehensive Fishery Management Plans ("FMPs"). 16 U.S.C. § 1853(a), (c). The proposals of the regional councils are subject to review by NMFS, which must examine each submission to ensure that it is consistent with the requirements under the Act. *See* 16 U.S.C. § 1854(a), (b). These substantive requirements demand that an FMP be "necessary and appropriate for the conservation and management of the fishery," 16 U.S.C. § 1853(a)(1)(A), be consistent with national standards set out in the Act, 16 U.S.C. § 1853(a)(1)(C), and abide by "any other applicable law," *id.*, including the Endangered Species Act.

In certain situations, NMFS may prepare an FMP without the input of the appropriate regional council via a "Secretarial amendment." However, the statute limits such situations, granting such authority only where:

(A) the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a fishery management plan for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management;

(B) the Secretary disapproves or partially disapproves any such plan or amendment, or disapproves a revised plan or amendment, and the Council involved fails to submit a revised or further revised plan or amendment; or

(C) the Secretary is given authority to prepare such a plan under this section.

16 U.S.C. § 1854(c)(1). In addition, NMFS may promulgate emergency regulations or interim measures (through the Secretary) in the event that "an emergency exists or [where] interim measures are necessary to reduce overfishing for any industry." 16 U.S.C. § 1855(c)(1). Regulations promulgated by NMFS (through the Secretary) pursuant to its emergency powers are limited in duration and may not exceed 180 days, but may be extended for an additional 180–day period, subject to the requirements of the Act. 16 U.S.C. § 1855(c)(3)(B).

The fisheries based in Hawaii, American Samoa, Guam, and the Northern Mariana Islands fall under the authority of the Western Pacific Fishery Management Council ("West Pac" or "the Council"). 16 U.S.C. § 1852(a)(1)(H). As a result, under the Magnuson–Stevens Act, West Pac is responsible for issuing various FMPs, including the Pelagics (Open Ocean) FMP central to the dispute in the present case.

### (2) *The Endangered Species Act*

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, establishes a comprehensive federal program to limit the number of fish, wildlife, and plant species rendered extinct as a consequence of their interactions with mankind. Under the ESA, the U.S. Fish and Wildlife Service ("FWS") and NMFS[3] (collectively, "the Services") are required to promulgate regulations listing those species that are "threatened" or "endangered" based on enumerated criteria and to "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533. The ESA further requires that each federal agency, in consultation with the Services, "insure that any action au-

3. The Secretaries of Interior and Commerce administer the ESA through FWS and NMFS, respectively. *See also infra* note 4.

thorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by [the Services] . . . to be critical." 16 U.S.C. § 1536(a)(1). Under the ESA and its implementing regulations, a federal agency must engage in formal consultation with the Services if an action undertaken by that agency "may affect" an endangered or threatened species or its critical habitat. 50 C.F.R. § 402.14(a).

In the event that formal consultation is required, the appropriate consulting Service (in this case, NMFS)[4] will review the proposed agency action by undertaking a Biological Opinion ("BiOp"). 50 C.F.R. § 402.14(g). The BiOp considers and details how the proposed agency action affects any listed species or its critical habitat. In making this inquiry, the Service must comport with the statute's "best science" requirement. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h). This comprehensive review of the agency's action generally leads to one of two possible results: (1) the action either "jeopardizes" or (2) does not jeopardize the listed species. 50 C.F.R. § 402.14(h)(3). When the consulting Service determines that an agency action is likely to jeopardize a protected species, it must provide "reasonable and prudent alternatives" ("RPAs") that would not jeopardize the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402. An RPA represents an alternative means to implement a proposed action, and would accomplish the same general purpose of the proposed action, without jeopardizing the listed species. On the other hand, if

the consulting Service reaches a "no jeopardy" conclusion, or if an RPA is available that would avoid jeopardy, the Service issues an Incidental Take Statement. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). An Incidental Take Statement permits an agency to undertake an action that leads to the "taking" (harassment, injury, or death)[5] of a particular number of listed species without violating the ESA's taking prohibitions. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

If one of the Services issues an Incidental Take Statement, the agency undertaking the proposed action ("action agency") is required to reinitiate consultations with one of the consulting Services where the action agency retains discretionary involvement over the action or control of the action has been retained or is authorized by a federal statute and:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16. In the event that an action agency determines that it must reinitiate formal consultations with a consulting Service, that Service will issue a new

---

4. FWS is not implicated in these proceedings because its jurisdiction is limited to terrestrial organisms.

5. "Take" is a word of art that is defined in the ESA. "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

biological opinion evaluating the proposed agency action.

### (3) *Dual Responsibilities*

In the unique situation presented by this case, NMFS is responsible for authorizing regulations and FMPs proposed by the eight regional councils under the Magnuson–Stevens Act but, at the same time, must evaluate its own actions under the ESA. In other words, NMFS serves as both the action agency and the consulting Service. *See, e.g.,* 2001 BiOp AR–604, at 9099 (listing the National Marine Fisheries Service, Southwest Region Sustainable Fisheries Division as the action agency and the National Marine Fisheries Service, Endangered Species Division as the consulting Service). In the context of the instant matter, this means that NMFS must approve amendments to the existing Pelagics FMP, but because the FMP could affect the listed turtles, NMFS must also issue a BiOp to determine if the FMP jeopardizes the listed turtles.

### (B) Factual Background

At the outset, the Court observes that the United States District Court for the District of Columbia has supplemented Federal Rule of Civil Procedure 56 with Local Civil Rule 56.1, which requires that each party submitting a motion for summary judgment attach a statement of material facts to which that party contends there is no genuine issue, with specific citations to those portions of the record upon which the party relies in fashioning the statement.[6] The party opposing such a motion must, in turn, submit a statement of genuine issues enumerating all material facts which the party contends are at issue and thus require litigation. *See* LCvR 56.1. Where the opposing party fails to discharge this obligation, a court may take all facts alleged by the movant as admitted. *Id.* As this Circuit has emphasized, "[LCvR 56.1] places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 151 (D.C.Cir.1996) (citing *Twist v. Meese,* 854 F.2d 1421, 1425 (D.C.Cir.1988); *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 406 (6th Cir.1992)). Because of the significance of this task and the potential hardship placed on the court if parties are derelict in their duty, courts require strict compliance with LCvR 56.1. *See id.* at 150 (citations omitted).

This Court strictly adheres to the text of Local Civil Rule 56.1 when resolving motions for summary judgment. *See HLA v. NMFS,* Civ. No. 01–0765 (D.D.C. Nov. 28, 2001) (order denying HLA's motion for relief from LCvR 56.1); *see also Burke v. Gould,* 286 F.3d 513, 519 (D.C.Cir.2002) (holding that district courts need to invoke

---

6. The Rule provides, in relevant part:

   Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . . In determining a motion for summary judgment, *the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.*

   LCvR 56.1 (formerly known as Local Rule 108(h)) (emphasis added).

Local Civil Rule 56.1 before applying it to the case). Although discretionary by the text of the Local Civil Rules, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1.

For purposes of this opinion, the Court primarily cites to the Administrative Record. In instances where an issue is raised regarding a material fact, the Court has reviewed the record citations by the parties to ensure that the parties' characterizations of the record are accurate. In addition, due to the complicated nature of this administrative law case, the Court must consider the procedural history of prior litigation between these parties. In some instances, relevant decisions in this prior case were cited in the parties' pleadings, but not contained in their Statements of Material Facts Not in Genuine Dispute. Therefore, the Court will use its discretion under Local Civil Rule 56.1 to consider this material outside the Statements provided by the parties. Having set forth these preliminaries, the Court moves to a discussion of the material facts not genuinely in dispute.

## (1) Endangered and Threatened Sea Turtles, the Fishery, and the 1998 BiOp

The five species of sea turtles implicated in these proceedings—and all sea turtles for that matter—are listed as endangered or threatened under the ESA. *See* 50 C.F.R. § 17.11. It is beyond dispute that, incidental to catching desired commercial fish, such as swordfish and tuna, the longline fishing industry ("the Fishery") kills or injures sea turtles each year. 2001 BiOp AR–604, at 9184–202.[7] For example, sea turtles may become entangled or hooked by the Fishery's gear, which can mortally wound, severely injury, or drown the turtles. *Id.* at 9184.

The Fishery is regulated by the Western Pacific Pelagics FMP ("Pelagics FMP"), which was implemented in 1987 under the authority of the Magnuson–Stevens Act, 52 Fed.Reg. 5,987 (Mar. 23, 1987). *Id.* at 9263; 2001 BiOp AR–138, at 3167. The Pelagics FMP replaced a preliminary FMP prepared by NMFS on behalf of the Secretary of Commerce in 1980. 2001 BiOp AR–604, at 9263. Since the Pelagics FMP was first issued, it has been revised and amended. 2001 BiOp AR–138, at 3167–68. In 1998, NMFS reinitiated consultations for the Pelagics FMP under the ESA, *id.* at 3164, because the anticipated incidental take statement in a prior BiOp had been exceeded, *id.* at 3171. These formal consultations produced the November 3, 1998, BiOp ("1998 BiOp"), which found that the Fishery, operating under the existing Pelagics FMP, was "not likely to jeopardize the continued existence and recovery of loggerhead, leatherback, olive ridley, green or hawksbill turtles or adversely modify critical habitat." *Id.* at 3164. Therefore, based on its no jeopardy conclusion, the 1998 BiOp established Incidental Take Statement levels for sea turtles captured, injured, or killed by the Fishery. *Id.* at 3165; 2001 BiOp AR–604, at 9101.

## (2) CMC Litigation and the Decision to Reinitiate Consultations

In 1999, several environmental advocacy

---

7. The Court has adopted the citation format indicated in Defendants' pleadings. Thus, citations to the Administrative Record will appear as follows: the name of the Administrative Record cited, followed by a dash with the appropriate tab number of document, and then the page or pages cited by the Court.

groups [8] filed suit against NMFS in the United States District Court for the District of Hawaii, *Center for Marine Conservation v. NMFS ("CMC")*, Civ. No. 99–00152 (D.Haw.2000), challenging the above-mentioned 1998 BiOp under the ESA and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331, *et seq.*[9] The plaintiffs in that case disputed the 1998 BiOp's no jeopardy finding. Nonetheless, the court upheld the no jeopardy conclusion reached in the 1998 BiOp. *CMC*, Civ. No. 99–00152, slip op. at 16–31 (Oct. 18, 1999). At the same time, it granted a limited injunction pending the completion of an Environmental Impact Statement ("EIS") as required by NEPA. *Id.* at 41–42.[10] According to the court, an Environmental Assessment [11]—the potential precursor to an EIS—has a "different purpose[ ] from [a] biological opinion[ ]. A 'no jeopardy' finding in the [1998] biological opinion cannot be compared to a 'Finding of No Significant Impact' which is what may or may not have been determined had Defendants prepared an Environmental Assessment." *Id.* at 37. Therefore, having determined that the plaintiffs had established both a likelihood of success on the merits and irreparable harm, the court reasoned that an injunction was appropriate because it " 'is the most common judicial response to a NEPA violation ... [, and it] ... maintain[s] the status quo while additional environmental data is obtained.' " *Id.* at 39 (quoting *Forelaws on Board v. Johnson*, 743 F.2d 677, 685 (9th Cir.1984)). The court refused to completely enjoin the Fishery's activities, but determined that "a carefully tailored injunction during the EIS preparation period [was] warranted." The court also required NMFS to complete the EIS by April 1, 2001. 2002 Regulations AR–1, at 5.

On May 18, 2000, concurrent with the *CMC* litigation, NMFS determined that the Fishery "had likely exceeded anticipated incidental take levels for olive ridley turtles" based on the levels set by the 1998 BiOp.2001 BiOp AR–604, at 9101. As a result, on June 7, 2000, NMFS reinitiated formal consultation as required under the ESA and the Services' implementing regulations. *Id.;* 16 U.S.C. § 1539; 50 C.F.R. § 402.16. This formal consultation would produce the March 29, 2001, BiOp (2001 BiOp) that originally prompted this litigation.

Accordingly, following the decision to reinitiate formal consultations, NMFS was engaged in two separate proceedings relat-

8. The same environmental advocacy groups have been involved in this litigation as Defendant Intervenors.

9. Under NEPA, a federal agency is required to prepare an Environmental Impact Statement when an agency action would significantly affect the environment. 42 U.S.C. § 4332(C). Among the statute's most salient requirements, the Statement shall consider the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, and alternatives to the proposed action. *Id.* At the same time, "NEPA does not require that any particular substantive action be taken in response to the environmental impact statement. The statute merely requires that the agency consider the statement ...." *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 83 n. 2 (D.C.Cir. 1991); *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *see also infra* note 13.

10. *See also* Defs.' Mem. in Support of their Mot. for Partial Summ. J. with Respect to Pls.' [sic] Sec. Cause of Action (the M.S.A. § Claim) at 8–9.

11. Under NEPA, 42 U.S.C. § 4332(c), and the pertinent implementing regulations, agencies generally prepare an Environmental Assessment first, in order to ascertain whether an Environmental Impact Statement is warranted. *See* 40 C.F.R. § 1508.9.

ed to the Western Pacific Pelagics FMP: the development of the EIS, as ordered by the *CMC* court, and the 2001 BiOp. On August 25, 2000, NMFS promulgated an emergency interim rule to comply with the *CMC* court's injunctive orders. 65 Fed. Reg. 51,992 (Aug. 25, 2000).[12] Likewise, on December 22, 2000, NMFS published a Draft EIS, consistent with the order in the *CMC* litigation, and accepted comments until January 29, 2001. 65 Fed.Reg. 80,-828 (Dec. 22, 2000). At the same time, NMFS was preparing the 2001 BiOp, based on its decision to reinitiate consultations on June 7, 2000. 2001 BiOp AR–604, at 9101.

On December 19, 2000, HLA counsel Jeffrey Leppo spoke with Judson Feder, NMFS Southwest Regional Counsel, over the telephone about obtaining a draft copy of the forthcoming 2001 BiOp.2001 BiOp AR–288, at 5628. It appears, based on a subsequent letter drafted by Leppo, that Feder indicated that "NMFS was unlikely to provide HLA with a draft version of the [BiOp] for review." *Id.* Nonetheless, Leppo persisted, formally lodging his request in a letter dated December 26, 2000. *Id.* at 5628–30. In the letter, Leppo argued that HLA was an "applicant" under the ESA and, therefore, was entitled to certain procedural rights under the statute and the Services' implementing regulations; such as receiving a draft BiOp and providing comments. *Id.* On January 3, 2001, Feder indicated that the agency had rejected HLA's request. 2001 BiOp AR–303, at 6262.

### (3) *The 2001 BiOp and the Release of the Final EIS*

The final BiOp was published on March 29, 2001, 2001 BiOp AR–604, at 9097, but not before a contentious month during which the parties quarreled over the release of the Draft BiOp, the time provided for comment, and the consideration given by NMFS to those comments, 2001 BiOp AR–580, at 8999. The March 29, 2001, BiOp reversed the 1998 BiOp, concluding that the Fishery, operating under the existing Pelagics FMP, was likely to jeopardize the continued existence of the green, leatherback, and loggerhead turtles. 2001 BiOp AR–604, at 9097, 9099–100. In particular, the data in the 2001 BiOp suggested that the highest incidence of takings resulted from the use of swordfishing gear, while takes from tuna gear were limited to particular geographic areas. *Id.* at 9202–06. Accordingly, the 2001 BiOp included a RPA expected to avoid jeopardizing the listed turtles, *id.* at 9227–36, which would effectively prohibit fishing techniques targeted at swordfish and impose certain time and area closures for tuna fishing, *id.* at 9229–33.

On the following day, March 30, 2001, NMFS released the Final EIS in compliance with the order issued by the *CMC* court. 2002 Regulations AR–1, at 1, 4. As required under NEPA, the Final EIS included "a reasonable range of alternative actions." *Id.* at 17. In this case, ten possible alternatives were presented, ranging from complete deregulation of the Fishery to varying time and area closures. *Id.* at 18–19. The preferred alternative ultimately selected by NMFS was almost identical to the RPA announced just a day before in the 2001 BiOp: Both would (1) prohibit swordfish-style longline fishing methods by United States-based vessels north of the equator; (2) close areas south of 15 North latitude to the equator, bounded by 145 West and 180 longitude, to all

---

**12.** Consistent with section 305(c) of the Magnuson–Stevens Act, 16 U.S.C. § 1855(c), the emergency interim rule was only effective for 180 days, but was renewed for an additional 180 days until August 20, 2001. Fed.Reg. 11,121 (Feb. 22, 2001).

U.S. longline vessels during the months of April and May of each year; and (3) impose certain permit registration restrictions. *See id.* at 126–29; 2001 BiOp AR–604, at 9229–32. As NMFS observed, however, "this EIS is not by itself a vehicle for the implementation of management regulations.... [T]he Magnuson–Stevens Act sets out a process, involving the Council and NMFS, to implement management actions." 2002 Regulations AR–1, at 78.

Although the terms of the preferred alternative were not self-executing—that is, NMFS had discretion to implement them through the West Pac Council—on March 30, 2001, the same day that the Final EIS was issued, the *CMC* court modified the terms of the injunctive order "in accordance with the findings in the EIS." *CMC,* Civ. No. 99–00152 (D.Haw. Mar. 30, 2001) (order modifying injunction) at 2. The court noted that the purpose of its "earlier injunction was to preserve the status quo ... until an EIS could be prepared." *Id.* Now that an EIS had been prepared, the court modified the terms of the injunction to reflect the preferred alternative in the EIS "until appropriate federal regulations [could] be enacted in accordance with law."[13] *Id.*

### (4) *Initiation of the Present Litigation*

On April 10, 2001, HLA filed suit in the United States District Court for the District of Columbia. Its one count Complaint alleged that the 2001 BiOp was both procedurally and substantively flawed. Compl. ¶ 2. HLA sought, among other things, to have the 2001 BiOp vacated and remanded to NMFS, to review and comment on the preparation of a new BiOp, and to require that the completion of the new BiOp comply with a court-imposed schedule. Compl. at 20 ("Wherefore" Paragraphs).

On June 6, 2001, several environmental advocacy groups, Turtle Island Restoration Network and the Ocean Conservancy[14] (collectively "Defendant–Intervenors" or "Conservation Groups")[15] filed a motion to intervene pursuant to Federal Rule of Civil Procedure 24. The Conservation Groups, which originally initiated the *CMC* litigation, asserted an interest in the preservation of the sea turtles and the possible effect that this case could have on that interest. The Conservation Groups also filed their own lawsuit, challenging the 2001 BiOp as inadequate in the United

---

13. The Court is not presented with the validity of the Final EIS issued in March 2001. Nonetheless, it is worth observing that "NEPA does not require that any particular substantive action be taken in response to the environmental impact statement. The statute merely requires that the agency consider the statement ...." *Foundation on Economic Trends v. Lyng,* 943 F.2d 79, 83 n. 2 (D.C.Cir. 1991); *see also Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) ("[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken.") (inter-

nal quotations omitted). Therefore, the Court can only surmise that the *CMC* court's March 30, 2001, Order, which effectively *required* NMFS to implement the preferred alternative in the Final EIS, was based on the assumed validity of the 2001 BiOp, not on a substantive requirement under NEPA.

14. The Ocean Conservancy filed its motion to intervene under the name Center for Marine Conservation. On June 25, 2001, the Center for Marine Conservation notified the Court that it had changed its name to the Ocean Conservancy.

15. The Conservation Groups are both nonprofit organizations that have an interest in conservation of sea turtle populations.

**10**

States District Court for the District of Hawaii.

Several days after the Conservation Groups moved to intervene, Defendants filed their Answer to Plaintiff's Complaint. Beyond responding to this litigation, however, NMFS was trying to implement the 2001 BiOp's RPA. But to implement the RPA, NMFS would need the cooperation of West Pac, because, as discussed *supra*, in most instances the Council must approve an amendment to an FMP. Thus, shortly after Defendants filed their Answer, Rebecca Lent, NMFS Regional Administrator for the Southwest Region, sent a memorandum to Dr. William T. Hogarth, Acting Assistant Administrator for the Fisheries. In this memorandum, Lent stated:

> I believe that the [West Pac] Council is aware of NMFS's obligation [under the ESA] to promulgate these measures but, if asked, *I will explain that a Secretarial amendment to the Pelagics Fishery Management Plan will be required if the reasonable and prudent alternatives, and the terms and conditions of the biological opinion* (also contained in the recently completed Final Environmental Impact Statement on this fishery), *are not implemented via Council action.*

2002 Regulations AR–2, at 1491 (emphasis added).[16] Apparently, this message registered with the Council. In an internal West Pac memorandum, the Executive Director of the Council observed:

The usual process for amending fishery management measures under an FMP is to develop a series of alternative measures for consideration, and through public meeting, and meetings of the Council narrow the selection to a preferred alternative. *This regulatory amendment is different in that the Council is obliged to implement the preferred alternative of the March 30th 2001 FEIS, which is itself based on the March 29th 2001 BiOp. There are basically only two alternatives for the Council to consider.* No action would force the Secretary of Commerce to impose these measures by a Secretarial amendment, or for the Council to amend the FMP and make it consistent with the FEIS preferred alternative and March 29th 2001 BiOp. Further its is [sic] critically important that the regulatory amendment be in place before June 2002, beyond which, the NMFS emergency rule cannot be extended.

2002 Regulations AR–19, at 1543 (emphasis added). However, at around the same time that West Pac noted the mandatory nature of the 2001 BiOp's RPA, it also registered its "continued opposition" to the 2001 BiOp.2002 Regulations AR–3, at 1494.[17]

On June 12, 2001, NMFS promulgated additional emergency interim regulations, in essence, codifying the *CMC* court's March 30, 2001, Order. 66 Fed.Reg. 31,-561 at 31,562 (June 12, 2001) ("The [*CMC*

**16.** Defendants do not dispute the substance of this memorandum. Defs.' Response to Pl.'s Statement of Material Facts in Support Mot. for Summ. J. on Sec. Claim for Relief ("Defs.' Response to Pl.'s Statement") ¶ 7.

**17.** This noted objection was not the first time that the West Pac Council registered its opposition to the 2001 BiOp. For example, on March 15, 2001, West Pac submitted comments to NMFS on the Draft 2001 BiOp. Among the comments submitted, the Council indicated that, after reviewing the Draft 2001 BiOp, "one is left with the unsettling conclusion that the data and rationale have been manipulated to fit a pre-conceived jeopardy opinion for leatherbacks, loggerheads, and Eastern Pacific green turtles." 2001 BiOp AR–573, at 8888 (emphasis removed). The Council also contended that the Draft 2001 BiOp's "jeopardy opinion is unwarranted." *Id.* at 8889 (emphasis removed).

court's] March 30, 2001, Order made effective immediately those aspects of the preferred alternative in the FEIS that are intended to mitigate the Hawaii longline fishery interactions with sea turtles. This emergency interim rule codifies that Order . . . .").[18] As noted above, the preferred alternative in the Final EIS proffered remedies largely consistent with the RPA in the 2001 BiOp. Accordingly, the emergency interim rule adopted measures consistent with the 2001 BiOp. *Id.*

Given the still pending injunction issued by the *CMC* court and the Hawaii court's pre-existing familiarity with the underlying subject matter in this case, on June 11, 2001, the Court ordered the parties to show cause why this case should not be transferred to the United States District Court for the District of Hawaii. *HLA v. NMFS,* Civ. No. 01–765 (D.D.C. June 11, 2001) (order). Despite these factors, both parties opposed transferring the case, and the Court acknowledged that ordering a transfer, *sua sponte,* " 'should be reserved for exceptional circumstances.' " *HLA v. NMFS,* No. 01–765 (D.D.C. Aug. 7, 2001) (order preserving venue and granting Defendants' Motion for an Enlargement of Time) at 2 (quoting *In re Scott,* 709 F.2d 717, 721 (D.C.Cir.1983)). As a result, the Court decided that it was inappropriate to transfer the case. *Id.*

On August 31, 2001, the Court ruled on the Conversation Groups' motion to intervene, granting the motion in part and denying it in part. *HLA v. NMFS,* Civ. No. 01–0765, slip op. at 12 (D.D.C. Aug. 31, 2001) ("Intervention Op."). Having noted

that "courts need not consider a motion to intervene as an all-or-nothing proposition," *id.* at 2 (citing *Harris v. Pernsley,* 820 F.2d 592, 599 (3d Cir.1987); *see also Forest Conservation Council v. U.S. Forest Serv.,* 66 F.3d 1489, 1495–96 (9th Cir. 1995)), the Court granted the Conservation Groups' motion as of right for the limited issue of defending the 2001 BiOp's jeopardy conclusion, *id.* at 6.[19]

**(5) *Summary Judgment, West Pac Action, and Defendants' Motion for a Stay***

With venue and intervention finally behind the Court, the parties began to brief their Cross–Motions for Partial Summary Judgment, with separate motions considering the procedural and substantive merits of the 2001 BiOp. Briefings on the procedural challenge were due first, followed by the substantive challenge.

Around the time that the parties were briefing their Motions for Partial Summary Judgment, between October 23 and 26, 2001, West Pac met for its One Hundred and Eleventh Meeting of the Western Pacific Management Council. During that time, "[t]he Council took final action to recommend that the National Marine Fisheries Service (NMFS) implement the reasonable and prudent alternative contained in NMFS' March 29, 2001, Biological Opinion concerning sea turtles." 2002 Regulations AR–34, at 1720.

On December 17, 2001, the same day that Defendants' Opposition to the substantive Motion for Partial Summary Judgment was due, NMFS notified the

---

**18.** On December 10, 2001, NMFS extended the emergency rule for an additional 180 days. 66 Fed.Reg. 63,630 (Dec. 10, 2001).

**19.** In limiting the scope of intervention to Plaintiff's substantive challenge to the 2001 BiOp's jeopardy conclusion, the Court noted that the Conservation Groups had filed their

own action challenging the 2001 BiOp in the United States District Court for the District of Hawaii. Intervention Op. at 12. As such, the Court concluded that the putative intervenors already had a forum to present their broader challenge to the 2001 BiOp.

Court of its decision to reinitiate consultations and issue a new BiOp.[20] *See* Defs.' Mot. for Partial Dismissal or, in the Alternative, for Stay of Proceedings Pending the Issuance of a New BiOp After Reinitiation of Consultation ("Defs.' Mot. for Stay") at 1. In support of their Motion, Defendants attached a memorandum from Rodney R. McInnis, Acting Regional Director of NMFS, which stated:

> new information is available which may improve NMFS' ability to quantify and evaluate the effects of the United States' pelagic fisheries and the reasonable and prudent alternatives in the BiOp on listed turtle populations. Therefore, ... NMFS is *"reinitiating section 7 consultation under the Endangered Species Act (ESA) on the potential effects of the pelagic fisheries under the FMP on threatened and endangered species."*

*Id.* Ex. A, at 1 (emphasis added) (*also available at* 2002 BiOp AR–114, at 821). The letter went on to note that "observer data since 1999 is available which may affect the estimated direct and indirect effects of the fisheries and the expected results of the reasonable and prudent alternative." *Id.* Thus, NMFS made clear that it had "decided to reinitiate consultation and prepare a new biological opinion." Defs.' Mot. for Stay at 2; *see also* Defs.' Reply, Mot. for Stay at 2 (stating that "the 2001 BiOp has limited continuing applicability and will soon be *superceded*") (emphasis added); *id.* at 3 (arguing that "the imminent issuance of a new biological opinion *renders litigation and judicial analysis of the 2001 BiOp imprudent*") (emphasis added). Based on this representation, and given the fact that the 2001 BiOp would be "superceded" by the new BiOp, the Court determined that the most prudent course would be to resolve Plaintiff's

procedural claims against NMFS in order to guide the agency as it issued a new BiOp.

In their Motion for a Stay, Defendants also represented to the Court that they expected to complete the new BiOp within 180 days, placing the date of completion at approximately May 12, 2002. *See id.* Ex. A, at 3; *id.* Ex. B ¶ 7 ("NMFS estimates that a new biological opinion will be issued within 180 days."). Accordingly, Defendants were operating under two deadlines: (1) the good faith representation they made to the Court and (2) the pending expiration of the emergency interim rule regulating the Pelagics FMP, 66 Fed.Reg. 31,561 (June 12, 2001) (extended for an additional 180 days by 66 Fed.Reg. 63,630 (Dec. 10, 2001)), which was due to expire on June 8, 2002. Despite the press of these two deadlines, the new BiOp was not completed within 180 days; in fact, it took NMFS almost 11 months to issue the 2002 BiOp. *See* 2002 BiOp AR–717, at 6012 (indicating that the 2002 BiOp was not issued until November 15, 2002).

After NMFS indicated that it would reinitiate consultations, the United States District Court for the District of Hawaii transferred the Conservation Groups' suit to this Court. On February 11, 2002, the Conservation Groups' case—challenging the 2001 BiOp as inadequate to protect the listed turtles—was consolidated with the present action. *HLA v. NMFS*, Civ. No. 01–0765 (D.D.C. Feb. 11, 2002) (order consolidating this case with *Turtle Island Restoration Network v. NMFS*, Civ. No. 02–153 (D.D.C.)).

On March 19, 2002, the Court issued an order referring Plaintiff's Motion for Partial Summary Judgment—which challenged the 2001 BiOp on procedural

---

**20.** There is some dispute over Defendants' intent in reinitiating consultations, particularly given the timing of NMFS's decision. *See infra* 26–32.

grounds—to Magistrate Judge John M. Facciola for a Report and Recommendation pursuant to Local Civil Rule 72.3(a). *HLA v. NMFS*, Civ. No. 01–0765 (Mar. 19, 2002) (order referring Plaintiff's Motion for Partial Summary Judgment to Magistrate Judge Facciola). In his April 25, 2002, Report and Recommendation, Magistrate Judge Facciola recommended that HLA's motion be granted in part and denied in part. *HLA v. NMFS*, Civ. No. 01–0765, slip op. at 17, 2002 WL 732363 (D.D.C. April 25, 2002) (Report & Recommendation). Magistrate Judge Facciola determined that HLA was an "applicant" under the ESA and NMFS's implementing regulations, and that HLA had been denied its rights as an "applicant" during the completion of the 2001 BiOp. *Id.* at 17, 2002 WL 732363. Additionally, Magistrate Judge Facciola found that, as an applicant, Plaintiff should have been provided with a copy of the draft BiOp prior to the agency finalizing it, under the agency's regulations. *Id.* at 24, 2002 WL 732363. Magistrate Judge Facciola suggested that fourteen days was a sufficient period of time for Plaintiff to review the draft opinion and provide comments. *Id.* at 26, 2002 WL 732363. Lastly, Magistrate Judge Facciola noted that since the agency was to promulgate a new BiOp by May of 2002, Plaintiff's argument that the BiOp should be remanded to the agency was no longer necessary to consider.[21] *Id.* at 25–26, 2002 WL 732363.

After a joint request for an extension of time, on May 29, 2002, both parties filed objections to Magistrate Judge Facciola's Report and Recommendation pursuant to Local Civil Rule 72.3(b). Plaintiff stated that it objected to Magistrate Judge Facciola's statement that it was no longer seek-ing remand of the 2001 BiOp. Pl.'s Limited Objection to Report & Recommendation at 1. In fact, Plaintiff noted that NMFS was now not in a position to issue a new BiOp until mid-November. *Id.* at 3 n. 3. Given that fact, Plaintiff reiterated its demand that the 2001 BiOp be remanded to the agency. Plaintiff also argued that Magistrate Judge Facciola's suggestion that the comment period last fourteen days was inadequate to satisfy its needs. *Id.* at 1. Defendants' objections essentially tracked their earlier arguments made before Magistrate Judge Facciola, namely that Plaintiff was not an applicant under the agency's rules, and, even if Plaintiff were an applicant, it was not entitled to a copy of the 2001 BiOp prior to its issuance. Defs.' Objections to Report & Recommendation at 1. These objections were followed by a volley of responses and replies, which concluded on June 17, 2002. *See HLA v. NMFS*, Civ. No. 01–0765, slip op. at 4–5 (D.D.C. Sept. 24, 2002).

### (6) *Promulgation of the June 2002 Regulations*

While the parties were registering their objections to Magistrate Judge Facciola's Report and Recommendation, NMFS was busy implementing the RPA from the then-valid 2001 BiOp, having obtained West Pac's approval prior to intimating to the Court that it would issue a new BiOp. Thus, despite Magistrate Judge Facciola's Report and Recommendation, which determined that the 2001 BiOp was procedurally deficient and the agency's own decision to issue a new BiOp, NMFS still decided to codify the terms of the 2001 BiOp's RPA.[22] On April 29, 2002, NMFS publish-

21. As the Court observed, *supra*, NMFS did not issue the 2002 BiOp until November 15, 2002.

22. Although West Pac approved the promulgation of the June 2002 Regulations based on the 2001 BiOp's RPA, and NMFS later indicated to the Court that the 2001 BiOp would be "superceded," NMFS continued with its efforts to codify the 2001 BiOp's RPA. Thus, NMFS secured the approval of the June 2002

**14**

ed notice in the Federal Registrar of a proposed rule to implement the RPA. 67 Fed.Reg. 20,945 (April 29, 2002) ("NMFS issues this proposed rule that would implement the reasonable and prudent alternatives of the March 29, 2001, Biological Opinion (BiOp) issued by NMFS under the Endangered Species Act (ESA).").[23] In a letter dated May 13, 2002, HLA submitted comments on the proposed rule. 2002 Regulations AR–219, at 2848. The letter contended that the 2001 BiOp was "unlawfully prepared, substantively flawed, and outdated." *Id.* at 2850.[24]

On May 20, 2002, West Pac prepared a recommended Regulatory Amendment, including a Regulatory Impact Review and Final Regulatory Flexibility Analysis. 2002 Regulations AR–228, at 2873. In the May 20, 2002, Regulatory Amendment, West Pac considered five alternative actions, including the RPA from the 2001 BiOp as required under the Magnuson–Stevens Act. *Id.* at 2908. However, West Pac considered these other alternatives, which differed from the RPA, merely "theoretical." *Id.* Under the "No Action" alternative, for example, West Pac hypothesized that, had the Council failed to implement the RPA, "NMFS would either

implement the reasonable and prudent alternative of the BiOp via a unilateral Secretarial amendment to the FMP's regulations, or would close one or more FMP fisheries until it reached a decision on how to proceed." *Id.* In addition, under the section headed "Measures Taken to Minimize Impacts on Small Businesses," West Pac noted that

> the preferred alternative is the only alternative that meets the requirements of the Endangered Species Act, (without closing one or more fisheries) through implementation of the reasonable and prudent alternative contained in the March 29, 2001 Biological Opinion. All other alternatives were either rejected on the grounds that they would either not meet this legal requirement or they would close one or more fisheries. Specifically, Alternatives A, C, D, and E did not meet the legal requirements of the Endangered Species Act Mandated Biological Opinion.

*Id.* at 2924. Moreover, West Pac interjected into this report a theory of transferred effects, noting that "[u]ntil other countries adopt similar standards, regulations that remove vessels or landings from

Regulations, then indicated to the Court that their legal basis would be "superceded," but did not go back to West Pac to secure its consent again, after this development.

23. In addition, around this time, West Pac issued a study entitled, *Expanded Analysis in Market-driven Transferred Effects on Sea Turtles.* 2002 BiOp AR–187, at 1556. The study considered the theory of "transferred effects." Under this theory, assuming that market demand for swordfish and tuna remains constant, if vessels from one geographic region are displaced, vessels from other areas will increase their fishing output in an effort to continue to satisfy consumer demand. Therefore, according to the theory of transferred effects, the emergency interim rules promulgated by NMFS displaced U.S. vessels with foreign fleets, which have a much higher level

of interactions with listed turtles. *See id.* ("Substitution of fresh swordfish from the Brazilian longline fishery for fish caught by Hawaii's swordfish longline fishery results in an adverse transferred **effect of up to 326 times more sea turtle takes per metric ton.**") (emphasis in original). As a result, the study found that "NMFS' Biological Opinion resulted in greater adverse impacts on listed turtle species through market-driven transferred effects." *Id.* at 1571.

24. The Administrative Record indicates that HLA's comments were discussed by NMFS, but the Record does not include the substance of these conversations. *See* 2002 Regulations AR–225, at 2857. To the extent that Defendants responded to Plaintiff's comments in the Final Rule, that matter is discussed below. *See infra* 24–25.

western Pacific domestic pelagic fleets may be a relatively ineffective tool [sic] for limiting the global mortality of turtles. The result would likely be to simply transfer the fish harvests (and consequently turtle interactions) to unregulated fisheries." *Id.* at 2926.

On May 23, 2002, NMFS issued a Record of Decision (ROD), which adopted the FEIS's Alternative 10 (the RPA) as the preferred alternative. *See* 2002 Regulations AR–242, at 2979–82. The ROD reiterated that the FEIS's preferred alternative adopted, by reference, the 2001 BiOp's RPA. *See id.* at 2977–78. In addition, the ROD noted that "the final agency decision requires several Western Pacific Fishery Management Council (Council) recommendations and NMFS decisions and actions. *The Council process is now complete for measures to implement the agency's final action. Major Council actions were completed during a meeting held October 23–26, 2001 ....*" *Id.* at 2978 (emphasis added). Finally, in a memorandum accompanying the ROD, NMFS indicated that "[t]hese measures implement the reasonable and prudent alternatives contained in NMFS' March 29, 2001, Biological Opinion." *Id.* at 2969.

On June 12, 2002, NMFS issued the now-contested Final Rule. 67 Fed.Reg. 40,-232 (June 12, 2002). The June 2002 Regulations declared, on several occasions, that the rule "implements the reasonable and prudent alternative of the March 29, 2001, Biological Opinion." *Id.* at 40,232; *id.* at 40,233 (same); *id.* at 40,235 (same); *id.* ("This final rule implements the *non-discretionary* reasonable and prudent alternative, as well as *non-discretionary* terms and conditions also in the BiOp.") (emphasis added); *see also* 2002 Regulations AR–242, at 2985 (stating that major components of the adopted alternative "are sea turtle conservation measures, including monitoring, enforcement, and interaction mitigation measures to ensure that continued utilization of sustainable fisheries in the western Pacific region *are not likely to jeopardize the continued existence of ESA listed species*") (emphasis added). In addition, NMFS listed the above-mentioned comments submitted by Plaintiff contending that the BiOp upon which the regulations are based was "unlawfully prepared, substantively flawed, and outdated." 67 Fed.Reg. 40,232 at 40,234 (June 12, 2002); *see also supra* note 24. NMFS responded by stating that it believed that the 2001 BiOp "represents the best available science concerning the status of endangered and threatened sea turtles," but did not address Plaintiff's other criticisms. *Id.*[25]

**25.** Plaintiff presented the following fact as material in their Statement of Material Facts: "NMFS did not ... answer HLA's question regarding the questionable legality of the 2001 BiOp" in response to HLA's comments, published in the Final Rule. Pl.'s Statement of Material Facts in Support of Mot. for Summ. J. on Sec. Claim ("Pl.'s Statement of Facts, Sec. Claim") ¶ 18. Defendants contested this fact: "As of the date of the Final Rule the consultation was underway and there was no basis for HLA's vague, ambiguous, and subjective contention about the 'questionable legality' of the 2001 BiOp except HLA's own legal memorandum." Defs.' Response to Pl.'s Statement of Material Facts in Support Motion for Summ. J. on Second Claim for Relief ("Defs.' Response to Pl.'s Statement, Sec. Claim") ¶ 18. In support of Defendants' proposition, they cite to this Court's September 24, 2002, Memorandum and Opinion. *See id.* However, Defendants' citation to the Court's Opinion is both temporally deficient and out of context. First, the Court's September 24, 2002, Memorandum and Opinion was issued over a month *after* NMFS promulgated the Final Rule. As a result, Defendants cannot use a quotation from this Opinion to refute a valid criticism at the time the June 2002 Regulations were promulgated. Indeed, had Defendants been truly convinced that Plaintiff's comments were "vague, ambiguous, and subjective" they had ample opportunity to say so in the Final Rule. Instead, Defendants chose

## (7) *Plaintiff's Motion to Amend and the Court's September 24, 2002, Opinion*

On July 9, 2002, Plaintiff sought leave from the Court to amend its complaint to add a second claim for relief challenging the June 2002 Regulations, which were premised on the 2001 BiOp. The Court granted the unopposed motion to amend on September 24, 2002. As a result of the Court's order, Plaintiff's complaint contained two separate counts: one challenging the 2001 BiOp (Count I) and the other challenging the June 2002 Regulations (Count II).

Also on September 24, 2002, the Court issued a memorandum opinion and order vacating and remanding the 2001 BiOp. *HLA v. NMFS*, Civ. No. 01–0765, slip op. at 5 (D.D.C. Sept. 24, 2002). The Court determined that Plaintiff was an "applicant" under NMFS's own regulations, *see* 50 C.F.R. § 402.02; 50 C.F.R. § 402.14(g)(5), and should have been afforded time to review and comment on the 2001 BiOp. *HLA v. NMFS*, Civ. No. 01–0765, slip op. at 5–6 (D.D.C. Sept. 24, 2002). Moreover, as an "applicant," Plaintiff was entitled to reasonable time to review and comment on the 2002 BiOp before its promulgation. *Id.* At the same time, the Court delayed issuing its remand order until November 15, 2002, the date that NMFS represented that the 2002 BiOp would finally be released. *Id.; see also id.* at 9–11. Indeed, the Court was

reluctant to remand the 2001 BiOp to the agency and leave no regulations in place until the 2002 BiOp [was] issued, given the concerns expressed by the agency and environmental groups in the case. Thus, until November 15, 2002, the Court [decided to] leave the current regulatory regime in place and use its equitable powers to stay this case until that date.

*Id.* at 11 n. 8. Under the assumption that these actions rendered the second count of Plaintiff's amended complaint (challenging the June 2002 Regulations, which were premised on the 2001 BiOp's RPA) moot, on November 15, 2002, the Court vacated and remanded the 2001 BiOp and dismissed both counts of Plaintiff's complaint with prejudice. *HLA v. NMFS*, Civ. No. 01–0765 (D.D.C. Nov. 15, 2002) (order vacating and remanding the 2001 BiOp to NMFS and dismissing the case with prejudice). In light of the fact that the 2001 BiOp had been vacated, and given that a new BiOp had been issued, the Court also dismissed the Conservation Groups' suit, which challenged the adequacy of the now-moot 2001 BiOp. *Id.*

## (8) *The 2002 BiOp*

As indicated above, on December 17, 2002, Defendants notified the Court of their decision to reinitiate consultations and issue a new BiOp, which would effectively supplant the contested 2001 BiOp.

---

not to address the matter. Moreover, Defendants' citation to the Court's quotation is out of context because the quotation was inserted by the Court to stress that the decision to remand the 2001 BiOp for procedural deficiencies did not address the substantive merits of the 2001 BiOp's conclusions. It does not follow, as Defendants contend, that a remanded BiOp is any less invalid because it was struck down for procedural, rather than substantive, deficiencies. Of course, it is important to note that the 2001 BiOp had not

been remanded to NMFS at the time it promulgated the June 2002 Regulations. Nevertheless, NMFS did not address Magistrate Judge Facciola's Report and Recommendation when it responded to Plaintiff's comments. In light of these factors, Defendants have failed to properly dispute Plaintiff's assertion that the Final Rule did not "answer HLA's question regarding the questionable legality of the 2001 BiOp." Pl.'s Statement of Facts, Sec. Claim ¶ 18.

Defs.' Mot. for Stay at 1; *see also supra* 18–20. There is some dispute over Defendants' motivation in reinitiating consultations, particularly given the fact that Defendants' Opposition was due on the substantive challenge to the 2001 BiOp at the time that they presented their Motion for Partial Dismissal, or in the Alternative, for a Stay. In Plaintiff's Statement of Material Facts, HLA contends that "[t]he 'new reinitiation strategy' was intended to 'circumvent' judicial review of the 2001 BiOp and generate a more supportive administrative record without any intention of reconsidering the 2001 BiOp jeopardy opinion or RPA." Pl.'s Statement of Material Facts in Support of Third Claim for Relief ("Pl.'s Statement of Facts, Third Claim") ¶ 38. In support of this contention, Plaintiff cites several e-mails sent by NMFS personnel:

> The pressure: the opposition to HLA's motion for summary judgment is due December 17. Adam [Issenberg, attorney for Defendants,] would like to circumvent that by calling a status conference with the Court next week. That is the opportunity to present our new reinitiation strategy.

2002 BiOp AR–105, at 798 (Dec. 13, 2001, e-mail from Judson Feder, NMFS Southwest Regional Counsel, to Rod McInnis, Acting Regional Administrator).

> The schedule discussion [provided to the Court] indicates that within the first 30 days we will determine if the original proposal [in the 2001 BiOp] still causes jeopardy. I have not seen or heard of this twist in the discussions thus far. Thus far I have heard that *we are not revisiting the original analysis* [in the 2001 BiOp] (other than to clarify some points) *and the original conclusions stand.*

2002 BiOp AR–111, at 810 (Dec. 12, 2001, e-mail from Penny Ruvelas, NMFS Section 7 Regional Coordinator to Judson Feder, NMFS Southwest Regional Counsel) (emphasis added).

> *What we are going to do is very different than reassessing our findings* [in the 2001 BiOp]. Craig and I will be working together to better explain/clarify the steps taken in the jeopardy analysis. We may beef up certain discussions and explanations in the Effects of the Action section and revise some language within the species response section to hopefully get the point across better. *This is "very different than sitting down with the data again and redoing our jeopardy analysis."*

2002 BiOp AR–113, at 819 (emphasis added).[26]

---

**26.** Plaintiff also asserts: "The issue of reinitiation appears to have first been raised by NMFS' regional counsel, Judson Feder, less than a month before NMFS' brief on the merits of HLA's challenge to the 2001 BiOp was due." Pl.'s Statement of Facts, Third Claim ¶ 34 (citing 2002 BiOp AR–89, at 660 ("Is there sufficient new information to justify reinitiation of the consultation on the Western Pacific pelagic fisheries?")). Plaintiff then notes:

> In response to Feder's inquiry, NMFS scientist Tim Price provided a detailed analysis and explanation why existing information did *not* justify reinitiation of consultation. AR Supp. II p. 660.

> ("[T]here is no new information available about the trend of the [western Pacific leatherback] population since the issuance of the biological opinion. Therefore, in my opinion, there is not sufficient new information to justify reinitiation of the consultation on the Western Pacific pelagics fisheries.").

*Id.* ¶ 35 (quoting 2002 BiOp AR–89, at 660) (alternations in original) (emphasis added). Defendants appear to dispute these statements, although they couch their response to Plaintiff's statements by "qualify[ing] [P]laintiff's characterization of the administrative record." Defs.' Response to Pl.'s Statement of Material Facts with Respect to the Third Claim for Relief ("Defs.' Response to Pl.'s

"Defendants dispute [P]laintiff's characterization of the administrative record," but focus exclusively on Plaintiff's averments regarding Defendants' *motivation*. Defs.' Response to Pl.'s Statement of Material Facts with Respect to the Third Claim for Relief ("Defs.' Response to Pl.'s Statement, Third Claim") ¶ 38. Because the Court finds Defendants' motivations immaterial, it will not consider that matter any further. However, whether the 2002 BiOp constituted a reevaluation of the vacated 2001 BiOp is material to the resolution of this action. In this regard, Defendants do not contest Plaintiff's statement that NMFS had no "intention of reconsidering the 2001 BiOp jeopardy opinion or RPA," nor do they proffer any evidence in the Administrative Record that refutes this statement. *See id.* Therefore, Defendants have failed to dispute Plaintiff's statement about the scope of the 2002 BiOp and the Court concludes, under Local Civil Rule 56.1, that Defendants had no "intention of reconsidering the 2001 BiOp jeopardy opinion or RPA."

As the Court also indicated above, when NMFS moved for Partial Dismissal, or in the Alternative, for a Stay, it made clear that it had "decided to reinitiate consultation and prepare a new biological opinion." Defs.' Mot. for Stay at 2; *see also* Defs.' Reply, Mot. for Stay at 2 (stating that "the 2001 BiOp has limited continuing applicability and will soon be *superceded*") (emphasis added). Defendants also attached a memorandum from Rodney R. McInnis, Acting Regional Director of NMFS, indicating that

> new information is available which may improve NMFS' ability to quantify and evaluate the effects of the United States' pelagic fisheries and the reasonable and prudent alternatives in the BiOp on listed turtle populations. Therefore, ... NMFS is *reinitiating section 7 consultation under the Endangered Species Act (ESA) on the potential effects of the pelagic fisheries under the FMP on threatened and endangered species.*

*Id.* Ex. A, at 1 (emphasis added) (*also available at* 2002 BiOp AR–114, at 821). The letter went on to note that "observer data since 1999 is available which may affect the estimated direct and indirect effects of the fisheries and the expected results of the reasonable and prudent alternative." *Id.*

Despite these representations to the Court, by mid-December, 2001, the e-mails cited by Plaintiff—and not disputed by Defendant (as they relate to the scope of the 2002 BiOp)—make clear that NMFS was doing something "very different than reassessing [its] findings" in the 2001 BiOp.2002 BiOp AR–113, at 819 ("This is very different than sitting down with the data again and redoing our jeopardy analysis."). Indeed, almost ten months later, "on October 9, 2002, NMFS announced ... that the scope of the 'action' under consideration had changed from the Fishery as operated prior to the 2001 BiOp to the 'fisheries as they operate today,' meaning the Fishery after NMFS implemented the RPA of the 2001 BiOp." Pl.'s Statement of Facts, Third Claim ¶ 49 (citing 2002 BiOp AR–464, at 4070–87).[27] Specifically, a

Statement, Third Claim") ¶¶ 34, 35. In other words, rather than point to portions of the record that dispute Plaintiff's characterization, Defendants cite to other portions of the record in an effort to explain an alternative interpretation of the above-mentioned e-mail. Because these facts go to Defendants' motivation in reinitiating consultations, which the Court has deemed immaterial, this matter will not be considered further.

**27.** "Defendants do not dispute [P]laintiff's characterization of the administrative record," other than a two-word parenthetical omitted by the Court, and indicated by the

memorandum issued by Dr. Charles Karnella, Administrator for the Pacific Islands Area Office ("PIAO," or the "action" component NMFS) indicated that PIAO requested that the ongoing consultation be amended:

> The PIAO requests the Office of Protected Resources (consulting agency) . . . amend the ongoing consultation to include evaluation of the pelagic fisheries under the [Pelagics FMP] *as they now operate.* By this we mean the fisheries regulated under the [Pelagics FMP] subsequent to issuance by NOAA Fisheries of the Biological Opinion on Authorization of Pelagic Fisheries under the [Pelagics FMP] (BiOp) on March 29, 2001, and as described by the preferred alternative contained in the [Pelagics FMP] Final Environmental Impact Statement (FEIS) issued by NOAA Fisheries on March 30, 2001. The "proposed action" would be the *fisheries as they operate today.*

2002 BiOp AR–464, at 4070 (memorandum dated Oct. 9, 2002) (emphasis added).

Plaintiff asserts in its Statement of Material Facts that "[t]he record is devoid of any explanation for NMFS' decision to change the scope of consultation." Pl.'s Statement of Facts, Third Claim ¶ 50. Defendants respond by noting, among other things, (1) that after NMFS's December 2001 decision to reinitiate, there was some "confusion" over the scope of the reconsultation, Defs.' Response to Pl.'s Statement, Third Claim ¶ 50; (2) that Dr. Karnella (author of the October 9, 2002, memorandum amending the scope of the 2002 BiOp) "had stated as early as April [2001] that 'given the passage of time and unfolding of events' consulting on the fisheries as they existed prior to the date of the CMC injunction 'comes across as artificial and contrived,' " *id.* (citing 2002 BiOp

AR–233, at 2004); and (3) that "much of the newer data used in consultation related to the present fishery, not to the pre–1999 fishery, and therefore a disconnect resulted," *id.* (citing 2002 BiOp AR–233, at 2004–05, 2007). While Defendants' response may offer a reasoned explanation as to why NMFS decided to change the scope of the 2002 BiOp, it does not offer any explanation as to how the amended scope of the 2002 BiOp remained consistent with the representations Defendants made to the Court on December 17, 2001, nor does it offer any explanation as to the legality of the 2002 BiOp, particularly given the fact that it did not revisit the conclusions of the vacated, and procedurally deficient, 2001 BiOp.

Furthermore, it is undisputed that, at least until the spring of 2002, "NMFS prepared a draft opinion based on the fishery as it was operating in 1999." Defs.' Response to Pl.'s Statement, Third Claim ¶ 51; *see also* Pl.'s Statement of Facts, Third Claim ¶ 51. Nonetheless, it is also apparent from the Record that—by at least October 9, 2002—NMFS decided to change course. 2002 BiOp AR–464, at 4070. In the interim, NMFS failed to meet the good-faith May 2002 deadline it provided to the Court, *see* Defs.' Mot. for Stay, Ex. A, at 3; *id.* Ex. B ¶ 7 ("NMFS estimates that a new biological opinion will be issued within 180 days."), and the expiration of the emergency interim rule, *see* 66 Fed.Reg. 63,630 (Dec. 10, 2001) (expiring June 8, 2002). After NMFS formally amended the scope of the 2002 BiOp, however, it was able to render its final decision in slightly more than a month. *See* 2002 BiOp AR–464, at 4070 (memorandum amending the scope of the 2002 BiOp, dated October 9, 2002); 2002 BiOp AR–717, at 6012 (November 15, 2002, BiOp).

On November 15, 2002, NMFS released the 2002 BiOp. *Id.* The scope of the 2002

ellipsis. Defs.' Response to Pl.'s Statement of Facts, Third Claim ¶ 49.

BiOp was entirely consistent with the October 9, 2002, memorandum: "the management regime, as modified by adoption of the Reasonable and Prudent Alternative in the March 2001 Biological Opinion and described by the preferred alternative of the March 2001 FEIS by NMFS ... constitute the action being considered in this opinion." *Id.* at 6018. Thus, as its baseline, the 2002 BiOp relies on the conclusions of the vacated and remanded 2001 BiOp, and does not constitute a reexamination of the 2001 BiOp's conclusions.[28] Based on its "as regulated" baseline, the 2001 BiOp reached a "no jeopardy" conclusion. *See id.* at 6012, 6267-68. Just as important, NMFS did not promulgate new regulations to supplant those codified on June 12, 2002 (the contested June 2002 Regulations).

As a practical result of the 2002 BiOp's "no jeopardy" conclusion, NMFS was not required to initiate a new set of RPAs. More importantly from Plaintiff's perspective, NMFS was not required to consult with HLA as an "applicant"—at least, regarding the issue of a new set of RPAs—because NMFS was not required to develop any RPAs under its "no jeopardy" finding. Instead, the 2002 BiOp issued a revised series of Incident Take Statement levels. *Id.* at 6328-30. The net result of the agency's behavior was that NMFS effectively insulated the substance of the 2001 BiOp from Court review.

#### (9) *Plaintiff's Motion for Reconsideration and Related Matters*

On November 25, 2002, Plaintiff timely filed a Combined Motion for Reconsideration, for an Expedited Hearing, and for Leave to File an Amended Complaint and Take Discovery. Because the Court was compelled to consider a motion for reconsideration under Federal Rules of Civil Procedure 59(e) or 60(b) prior to granting leave to amend, *see Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C.Cir.1996), the Court entertained Plaintiff's motion to reconsider separately. As a result, on January 17, 2003, the Court first issued a Memorandum and Order regarding Plaintiff's motion to reconsider. *HLA v. NMFS,* Civ. No. 01-0765 (D.D.C. Jan. 17, 2003) (memorandum and order granting in part and denying in part Plaintiff's motion for reconsideration). In granting in part Plaintiff's unopposed motion to reconsider under Rule 59(e), the Court observed:

> Although the June 12, 2002, regulations were already in force when the Court issued its November 15, 2002, order, the Court was under the impression that by vacating the 2001 BiOp, the regulations on which it was premised would also fall.[29] Nonetheless, the parties do not dispute the fact that the regulations are still in force, and the Plaintiff was never granted a hearing on the second count of its amended complaint, challenging these regulations.

*Id.* at 4. Thus, "in order to avoid manifest injustice," the Court granted Plaintiff's unopposed motion to reconsider the second count of its complaint, but—having already vacated the 2001 BiOp—denied Plaintiff's motion with respect to the first count of its complaint. *Id.*

After dispensing with Plaintiff's motion to reconsider, the Court issued a separate

---

28. In other words, the 2002 BiOp evaluated the effect that the Fishery's activities had on the listed turtles, operating under the time and area closures in the June 2002 Regulations, which implemented the 2001 BiOp's RPA.

29. *See, e.g., HLA v. NMFS,* Civ. No. 01-0765, slip. op. at 11 n. 8 (D.D.C. Sept. 24, 2002) (stating that the Court was "reluctant to remand the 2001 BiOp to the agency *and leave no regulations in place* until the 2002 BiOp [was] issued").

Memorandum and Order regarding Plaintiff's motions to amend its reinstated complaint, for an expedited hearing schedule, and to take discovery. *HLA v. NMFS*, Civ. No. 01–0765, slip op. at 1 (D.D.C. Jan. 17, 2003) (memorandum and order). The Court granted Plaintiff's motion to amend pursuant to Federal Rule of Civil Procedure 15(d), observing that Plaintiff's supplemental pleading was "so intertwined in the proceedings already before the Court" that it justified granting Plaintiff leave to amend. *Id.* at 7. The Court also granted Plaintiff's motion for an expedited hearing schedule, observing that the Magnuson–Stevens Act provides for expedited consideration of Plaintiff's second claim. *Id.* (citing 16 U.S.C. § 1855(f)(4)). Finally, the Court denied, without prejudice, Plaintiff's motion to take discovery related to the third count of its reinstated, amended complaint, challenging the 2002 BiOp. *Id.* at 8–9.

**(10) *The Conservation Groups' Second Motion to Intervene***

After the Court reopened Plaintiff's case, the Conservation Groups again filed a motion to intervene—this time in order to defend the June 2002 Regulations and the 2002 BiOp. On August 31, 2003, the Court granted the Conservation Groups' motion, but expressly limited the scope of intervention to defending NMFS's actions.

**(11) *The Present Cross–Motions for Partial Summary Judgment***

After the Court reopened this case and readmitted Defendant–Intervenors, and Defendants submitted the remaining portions of the Administrative Record, this protracted litigation was once again ripe for disposition. Pursuant to the briefing schedule established in the Court's January 17, 2003, Orders, the parties presented their Cross–Motions for Summary Judgment regarding Plaintiff's second claim for relief, challenging the June 2002 Regulations, and Plaintiff's third claim, seeking to overturn the 2002 BiOp.

Plaintiff's reinstated, Second Amended Complaint alleges that the June 2002 Regulations were promulgated in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*—namely, that the Rule "was not completed in accordance with law, is arbitrary and capricious, and an abuse of discretion." Sec. Am. Compl. ¶ 62. For the same legal reasons, Plaintiff also challenges the 2002 BiOp. *Id.* ¶ 66. Consequently, Plaintiff requests, among other things, that the Court remand the 2002 BiOp to NMFS for preparation of a new BiOp; set aside the June 2002 Regulations; enjoin NMFS to prepare the new BiOp through a lawful process that provides Plaintiff, and West Pac,[30] a meaningful opportunity to review and comment on the new BiOp as "applicants"; enjoin NMFS to prepare the new BiOp pursuant to a court-approved schedule; enjoin NMFS to adopt a court-approved interim Fishery management regime pending the completion of the new BiOp; and award Plaintiff its reasonable fees, costs, expenses, and disbursements associated with this litigation. *Id.* at 21 ("Wherefore" Paragraph).

**II. LEGAL STANDARD**

The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,"

---

**30.** The Court notes that the West Pac Council is not a party to this litigation. Thus, the Court has not reached, nor will it reach, the question of whether the Council is an "applicant" under the ESA and the Services' implementing regulations.

or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C) and (D).[31] Although the judiciary bears the responsibility under the APA to set aside agency decisions that meet this description, *see MD Pharmaceutical, Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C.Cir.1998); *Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 755 (D.C.Cir.2001), "[t]he scope of review under the 'arbitrary and capricious standard' is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Nonetheless, this Circuit has held that "where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action." *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C.Cir.1994) (citing *American Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C.Cir.1992)).

Summary judgment is appropriate if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994); Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265, (1986). Similarly, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judg-ment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975); *Long v. Gaines*, 167 F.Supp.2d 75, 85 (D.D.C.2001). Summary judgment is also appropriate where, as here, review is of the administrative record. *See, e.g., Richards v. INS*, 554 F.2d 1173, 1177 n. 28 (D.C.Cir.1977); *Williams v. Dombeck*, 151 F.Supp.2d 9, 12 (D.D.C.2001).

## III. DISCUSSION

On its face, this litigation involves the health and survival of five listed sea turtles, the green, hawksbill, leatherback, loggerhead, and olive ridley turtles, and the effect that the longline fishing industry has on their survival. As a practical matter, however, this litigation—like most disputes in administrative law—involves procedural and substantive matters concerning NMFS's inherent authority under the Magnuson–Stevens Act, 16 U.S.C. § 1801, *et seq.*, the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* While the substance of an administrative law proceeding may change from case to case or from agency to agency, the most basic tenet of administrative law remains the same: Agencies derive their authority from law and may not exceed its limitations or circumvent its requirements.

### (A) Plaintiff's Second Claim for Relief: The June 2002 Regulations

In the Court's January 17, 2003, Memorandum and Order, the Court asked the

---

**31.** Plaintiff's second claim for relief, which challenges the June 2002 Regulations as issued under the Magnuson–Stevens Act, is subject to review under the APA. 16 U.S.C. § 1855(f)(1); *see also id.* (stating that "the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of [the APA]"). Plaintiff's third claim for relief, which seeks to set aside the 2002 BiOp as issued under the ESA, is also subject to re-view under the APA. *Bennett v. Spear*, 520 U.S. 154, 175, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (observing that the ESA's citizen-suit provision does not preclude review under the APA); *see also Sierra Club v. United States Army Corp. of Eng'rs*, 295 F.3d 1209, 1216 (D.C.Cir.2002) (stating that "[c]hallenges brought under [the ESA] are reviewed by the arbitrary and capricious standard, as defined by the Administrative Procedure Act.").

parties to brief the following question: "Why are the June 2002 regulations still valid after the 2001 BiOp was vacated by this Court?" *HLA v. NMFS*, Civ. No. 01–0765, slip op. at 8 n.3 (D.D.C. Jan. 17, 2003) (memorandum and order resolving Plaintiff's motions to amend its reinstated complaint, for an expedited hearing schedule, and to take discovery). Plaintiff responded to this question quite simply: "HLA is unable to answer this question. The June 2002 regulations were promulgated for the express purpose of implementing the 2001 BiOp, which has been vacated." Pl.'s Mot. for Summ. J. on Sec. Claim for Relief and Memo. of Points and Authorities in Support Thereof ("Pl.'s Mot., Sec. Claim")[32] at 8. On the other hand, the Court has looked through Defendants' briefings in vain to find a satisfactory response to this question—that is, one that is grounded in law. Indeed, Defendants rely on novel and untenable theories of administrative law, and they often proffer arguments that contradict the very proposition they are trying to advance. In light of this fact, the Court is left to conclude that the June 2002 Regulations are arbitrary and capricious, and shall be vacated and remanded to NMFS. In reaching this conclusion, however, the Court does not reach Plaintiff's bad faith and science-based arguments.[33]

### (1) *Defendants' ESA Argument*

■ Defendants begin by asserting an "independent agency actions" argument under the ESA. *See* Defs.' Mot., Sec. Claim at 15 ("Although related, the 2001 BiOp,

the June 2002 regulations, and the 2002 BiOp are all independent agency actions."). According to Defendants:

> The 2001 BiOp analyzed the impacts of the Fishery as it existed prior to the injunctions in the *CMC* litigation. Because it concluded that the Fishery was likely to jeopardize the continued existence of endangered and threatened sea turtles, NMFS—consistent with the ESA—set forth a RPA. *The June 2002 regulations extended and formalized the implementation of the RPA set forth in the 2001 BiOp.*

*Id.* (emphasis added). Defendants continue by noting that the "ESA imposes a substantive obligation on the action agency (here NMFS' Office of Sustainable Fisheries) to ensure that actions that it authorizes are not likely to jeopardize the continued existence of listed species." *Id.* (citing *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1304–05 (9th Cir.1993)). However, Defendants also state that "the action agency is not bound to adopt a RPA recommended by the consulting agency and may either continue with its proposed action or implement a different set of mitigating actions as long as the action agency independently determines that its own actions are not likely to jeopardize the continued existence of listed species." *Id.* (citing *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193–94 (9th Cir.1988); *see also Bennett v. Spear*, 520 U.S. 154, 170, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). Therefore, according to Defendants, "the vacatur of a biological opinion issued by the consulting agency on *procedural (as*

---

**32.** The Court will shorten the title of the citations to the parties' pleadings throughout the rest of this opinion. The appropriate document will be referred to by the party and the appropriate pleading title, followed by a comma and the requisite claim to which the cited document refers (for example, Pl.'s Mot., Sec. Claim at 4; Defs.' Opp'n, Third Claim at 2;

Pl.'s Reply, Sec. Claim at 5; Def.-Intervenors' Opp'n, Third Claim at 3).

**33.** Similarly, the Court does not address Defendants' and Defendant–Intervenors' counter-arguments, which respond to Plaintiff's bad faith and science-based arguments.

*opposed to substantive) grounds* does not alleviate the obligation of the action agency to ensure that its actions are not likely to jeopardize the continued existence of the species." *Id.* at 15–16 (emphasis added).

Based on this argument, Defendants contend that an action agency is required to take certain steps to mitigate jeopardy to a listed species, even where the Services' conclusions were invalidated. *See* Defs.' Reply, Sec. Claim at 4 ("Although the regulations originally were intended to implement the 2001 BiOp RPA, they also effectuate NMFS' substantive obligation to ensure that its actions avoid the likelihood of jeopardy to sea turtles . . . ."). Applying that theory to this case, Defendants argue that, even though the 2001 BiOp was vacated on procedural grounds, the action agency is still required to implement the RPA because, in the action agency's own judgment, such an outcome is mandated by the ESA. *See* Defs.' Mot., Sec. Claim at 15–16; Defs.' Reply, Sec. Claim at 4–5.

The ESA clearly imposes a substantive legal requirement on the action agency. 16 U.S.C. § 1536(a)(2). Section 7(a), which requires interagency cooperation, specifically dictates that "[e]ach *Federal agency shall,* in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an *'action agency'*) is *not likely to jeopardize the continued existence of any endangered species* . . . ." 16 U.S.C. § 1536(a)(2) (emphasis added). Indeed, as the Supreme Court has noted: "One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act." *Tenn. Valley Auth. v.*

*Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

Thus, it appears beyond dispute that the ESA imposes a substantive legal requirement on the action agency to ensure that its actions will not likely jeopardize listed species. And yet, in an effort to advance their argument on this ground, Defendants point the Court to *Resources Limited, Inc. v. Robertson,* 35 F.3d 1300, 1304–05 (9th Cir.1993). *See* Defs.' Reply, Sec. Claim at 4. As that case clearly demonstrates, however, Defendants' substantive obligation under the ESA still must comport with the APA's arbitrary and capricious standard, *see Resources Limited,* 35 F.3d at 1304,[34] rendering the decision announced in *Resources Limited* fatal to Defendants' argument.

In *Resources Limited,* the Ninth Circuit reviewed the decision of an action agency, the Forest Service, under the APA's "arbitrary and capricious" standard. *Id.* (reviewing the action agency's decision under 5 U.S.C. § 706(A)(2)). The plaintiffs challenged the Flathead National Forest Land and Resource Management Plan ("Plan") under NEPA, the ESA, and the National Forest Management Act. *Id.* at 1302. In the Ninth Circuit's review of the plaintiffs' ESA challenge, the court noted that the Forest Service engaged in formal consultations with FWS over the Plan. *Id.* at 1304. "The FWS concluded that the Plan was not likely to jeopardize the continued existence of any listed species." *Id.* Although the FWS issued a no jeopardy finding, the court went on to observe:

> Consulting with the FWS alone does not satisfy an agency's duty under the Endangered Species Act. *Pyramid Lake [Paiute Tribe v. U.S. Dept. of Navy,* 898 F.2d 1410, 1415 (9th Cir.1990) ]. An

---

**34.** *See also Sierra Club v. United States Army Corps of Eng'rs,* 295 F.3d 1209, 1216 (D.C.Cir. 2002) (observing that "[c]hallenges brought

under [the ESA] are reviewed by the arbitrary and capricious standard, as defined in the Administrative Procedure Act.").

agency cannot "abrogate its responsibility to ensure that its actions will no [sic] jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious." *Id.*

*Id.* (quoting *Pyramid Lake,* 898 F.2d at 1415). The court then held that the action agency's "reliance on the FWS's opinion was not justified in light of its failure to provide the FWS with all of the data and information required by 50 C.F.R. § 402.14(d)." [35] *Id.* at 1305. Consequently, according to the *Resources Limited* court, the action agency's reliance on a biological opinion, which was based on incomplete data, was arbitrary and capricious. *Id.*

Although *Resources Limited* supports Defendants' contention that an action agency bears certain substantive duties under the ESA, *see id.* at 1304 ("Consulting with [the appropriate consulting Service] alone does not satisfy an [action] agency's duty under the Endangered Species Act."), the court held that an action agency's " 'decision to rely on a [Service's] biological opinion must not have been arbitrary or capricious.' " *Id.* at 1304 (quoting *Pyramid Lake,* 898 F.2d at 1415). This additional requirement ensures that, in fulfilling its substantive obligation under the ESA, the action agency does not violate the APA's arbitrary and capricious stan-

dard. *See Sierra Club v. United States Army Corp. of Eng'rs,* 295 F.3d 1209, 1216 (11th Cir.2002) (stating that "[c]hallenges brought under [the ESA] are reviewed by the arbitrary and capricious standard, as defined by the Administrative Procedure Act.").

Accordingly, Defendants must defend their reliance on the vacated 2001 BiOp's RPA under the arbitrary and capricious standard provided under the APA. *Id.* In this regard, Defendants contend that "the vacatur of a biological opinion issued by the consulting agency on *procedural (as opposed to substantive) grounds* does not alleviate the obligation of the action agency to ensure that its actions are not likely to jeopardize the continued existence of the species." Defs.' Mot., Sec. Claim at 15–16 (emphasis added). Defendants do not cite to a single case to support their "procedural (as opposed to substantive) grounds" distinction, *see id.* at 15, and the Court is not aware of any theory of administrative law that buttresses this argument, *see, e.g., Bennett v. Spear,* 520 U.S. 154, 172, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.") (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).[36] In fact, there is no

35. The regulation provides, in relevant part, that the action agency "shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." 50 C.F.R. § 402.14(d).

36. In practice, Defendants' argument would create numerous problems, which they have failed to consider in their briefings. Two of these problems are worthy of mention here. First, Defendants' "procedural (as opposed to substantive) grounds" distinction would viti-

ate the procedural guarantees provided under the ESA where, as here, the action agency has failed to conduct its own biological assessment. Second, Defendants' argument would support the promulgation of regulations based on a BiOp that has been vacated on *substantive* grounds. To illustrate, Defendants argue that the 2001 BiOp RPA and the June 2002 Regulations are "independent agency actions"; it follows then, under Defendants' argument, that an action agency is free to adopt a *substantively* flawed BiOp RPA without any legal repercussions.

distinction between procedural and substantive deficiencies under the APA. *See* 5 U.S.C. § 706. Regardless of whether or not an agency action is declared substantively unlawfully, 5 U.S.C. § 706(2)(A), or procedurally flawed, 5 U.S.C. § 706(2)(D), the APA provides for the same remedy: "The reviewing court shall . . . hold unlawful and set aside [the] agency action," 5 U.S.C. § 706.

In this case, NMFS, in its capacity as the action agency, did not conduct an individual biological assessment to determine whether the Fishery was likely to jeopardize the continued existence of the listed turtles. Rather, the action component of NMFS relied exclusively on the 2001 BiOp, which was issued by the consulting component of NMFS and ultimately vacated by the Court. Prior to the promulgation of the June 2002 Regulations, which "implement[ed] the reasonable and prudent alternative of the March 29, 2001, Biological Opinion," 67 Fed.Reg. 40,232 (June 12, 2002), the action component of NMFS was aware of Magistrate Judge Facciola's Report and Recommendation, which determined that the 2001 BiOp was procedurally deficient.[37] Even after the Court annulled the June 2002 Regulations' legal underpinning—the 2001 BiOp— NMFS still kept the regulations in force without formally adopting another basis for their continued application.[38] Indeed, after the Court's September 24, 2002, Memorandum Opinion and Order, NMFS was fully aware that it had violated Plaintiff's procedural rights and that "[t]hese violations merit[ed] vacating and remanding the 2001 BiOp to the agency." *HLA v. NMFS*, Civ. No. 01–0765, slip op. at 5 (D.D.C. Sept. 24, 2002). The Court even provided the agency with an opportunity to enact new regulations, *see id.* at 11 n. 8 ("Thus, until November 15, 2002, the Court will leave the current regulatory regime in place and use its equitable powers to stay this case until that date."), but Defendants chose not to act.

The 2001 BiOp—the only articulated basis for the June 2002 Regulations—was declared unlawful by the Court and remanded to NMFS. *Id.* at 5. Consequently, Defendants' continued reliance on a vacated BiOp, without any *independent* assessment reached by the action component of NMFS, is by definition arbitrary and capricious. *See Resources Limited*, 35 F.3d at 1304; *Pyramid Lake*, 898 F.2d at 1415; *see also* 5 U.S.C. § 706(2)(A). Indeed, Defendants fail to explain how an unlawful biological opinion provides any legal basis for the continued application of the June 2002 Regulations. Rather, Defendants present a failed argument: They contend that the June 2002 Regulations do not necessarily require the 2001 BiOp to be effective in order to remain valid because the action component of NMFS also bears a substantive obligation under the ESA. Defs.' Reply, Sec. Claim at 4. While such an argument might be true if the action agency had done an independent assessment to fulfill its substantive obligation under the ESA, the facts of this case preclude such an argument because the action

---

37. Despite the implications of Magistrate Judge Facciola's recommendation, NMFS did not respond to Plaintiff's comments concerning this matter. *See supra* 24–25; *see also* 67 Fed.Reg. 40,232, at 40,233–34 (June 12, 2002).

38. Defendants contend that the 2002 BiOp provides an independent basis for the continued application of the June 2002 BiOp. Defs.'

Mot., Sec. Claim at 16 ("Even assuming for the sake of argument that it would have been improper to allow the regulations to remain in place after the biological opinion was vacated, that situation was avoided in the present case by completion of the 2002 BiOp on the same date that the Court vacated the 2001 BiOp."); Defs.' Reply, Sec. Claim at 4. The Court will consider this argument *infra*.

component of NMFS relied *solely* on the vacated 2001 BiOp in promulgating the June 2002 Regulations.

In other words, Defendants contend that the ESA imposes a substantive legal obligation on the action agency, not the consulting Service. The Court does not dispute this claim. *Supra* at 39 ("The ESA clearly imposes a substantive legal requirement on the action agency."); *see also Tenn. Valley Auth.*, 437 U.S. at 173, 98 S.Ct. 2279 ("Its very words [the ESA's] affirmatively command all federal agencies 'to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence' of an endangered species or 'result in the destruction or modification of habitat of such species....'") (quoting 16 U.S.C. § 1536) (omission in original, emphasis removed). However, in order for Defendants to prevail on their underlying argument—that the action agency acted properly in maintaining the RPA of an invalidated BiOp— Defendants must establish that the action agency did not act arbitrarily or capriciously in fulfilling its mandate under the ESA. *See Resources Limited*, 35 F.3d at 1304; *Sierra Club*, 295 F.3d at 1216. The Court has determined that Defendants have failed to satisfy the demands of this argument and concludes that Defendants' action under the ESA in promulgating the June 2002 Regulations was arbitrary, capricious, and contrary to law.

### (2) *Defendants' Magnuson–Stevens Act Argument*

■ Although the action agency component of NMFS was under no legal obligation to formalize the 2001 BiOp's RPA based on its procedural deficiencies, and such an action is arbitrary and capricious under the ESA, Defendants nevertheless argue in the alternative that the regulations were promulgated consistent with their authority under the Magnuson–Stevens Act. Specifically, Defendants argue that the Magnuson–Stevens Act's "requirement that the FMP be consistent with 'other applicable law'" (in this case, the ESA) again obliged the agency to implement and maintain the June 2002 Regulations.[39] Defs.' Reply, Sec. Claim at 4 (quoting 16 U.S.C. § 1853(a)(1)(C)). As the Court has already observed, the Magnuson–Stevens Act vests NMFS with the authority to promulgate rules affecting various regional FMPs under its purview. Consequently, Defendants potentially might be able to construct an alternative means of support for the June 2002 Regulations under the Magnuson–Stevens Act. Nonetheless, Defendants' Magnuson–Stevens Act argument must fail for the same basic reason that their argument under the ESA failed: outside of the unlawful 2001 BiOp, the agency relied on no other legal basis to support the continued application of the June 2002 Regulations.

As the Court has already explained above, the June 2002 Regulations were promulgated to "implement[ ] the reasonable and prudent alternative of the March 29, 2001, Biological Opinion." 67 Fed.Reg. 40,232 (June 12, 2002).[40] According to Defendants' circular logic, however, not only

39. Defendant–Intervenors also advance this argument in their Opposition. Def.-Intervenors' Opp'n, Sec. Claim at 4 ("The FMP was amended to include the fishing restrictions, as required by the MSA's provision that FMPs be consistent with the Endangered Species Act.") (citing 16 U.S.C. § 1853(a)(1)).

40. At various points in their briefings, Defendants also assert that the June 2002 Regulations were issued to satisfy "the final requirements of the Hawai'i court's injunction in the *CMC* litigation." Defs.' Mot., Sec. Claim at 16. However, the Record belies Defendants' contention. *See, e.g.,* 67 Fed.Reg. 40,232 (stating that the rule "implements the reason-

were "the [June 2002] regulations originally ... intended to implement the 2001 BiOp RPA," but they also effectuate "the Magnuson Act's requirement that the FMP be consistent with 'other applicable law,'" thereby reincorporating the ESA's substantive requirement through the Magnuson–Stevens Act's "other applicable law" provision. Defs.' Reply, Sec. Claim at 4; *see also* Def.-Intervenors' Opp'n, Sec. Claim at 4. Although Defendants advance several arguments for the continued validity of the June 2002 Regulations, each is premised on the ESA's substantive requirement. *See, e.g.*, Defs.' Reply, Sec. Claim at 4; *see also* Def.-Intervenors' Opp'n, Sec. Claim at 4.

In reviewing the agency's reasoning under the Magnuson–Stevens Act, the Court is reminded that "[t]he scope of review under the 'arbitrary and capricious standard' is narrow and a court is not to substitute its judgment for that of the agency." *State Farm Ins.*, 463 U.S. at 43, 103 S.Ct. 2856. Nonetheless, the

> reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action *solely by the grounds invoked by the agency*. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.

*SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (emphasis added). Accordingly, because the June 2002 Regulations were *solely* grounded in an "implement[ation of] the reasonable and prudent alternative of the March 29, 2001, Biological Opinion," 67 Fed.Reg. 40,232 (June 12, 2002), which the Court determined was formulated in an unlawful manner, the June 2002 Regulations are arbitrary and capricious under the APA. As a result, the Court cannot accept Defendants' Magnuson–Stevens Act argument.

More importantly, even if the Court were to presume that the June 2002 Regulations did not implement the 2001 BiOp's RPA, the Record also corroborates that West Pac and NMFS failed to analyze the impact of the regulations as dictated by the Magnuson–Stevens Act. Specifically, NMFS did not consider whether the regulations were "necessary and appropriate" or conformed with the ten national standards set out under the Magnuson–Stevens Act. *See* 67 Fed.Reg. 40,232 (June 12, 2002).

Under the Magnuson–Stevens Act, NMFS must ensure that any regulations affecting the Pelagics FMP are "necessary and appropriate for the conservation and management of the fishery," 16 U.S.C. § 1853(a)(1)(A), consistent with the ten national standards set out in the Act, 16 U.S.C. § 1853(a)(1)(C), and consonant with "any other applicable law," *id.*, including the Endangered Species Act. In addition, NMFS has promulgated regulations that further illuminate the ten national standards, including provisions relating to the costs and benefits of any proposed regulations. 50 C.F.R. § 600.340.

able and prudent alternative of the March 29, 2001, Biological Opinion."); *id.* at 40,233 (same); *id.* at 40,235 (same); *id.* ("This final rule implements the *non-discretionary* reasonable and prudent alternative, as well as *non-discretionary* terms and conditions also in the BiOp.") (emphasis added); *see also* 2002 Regulations AR–242, at 2985 (stating that major components of the adopted alternative "are sea turtle conservation measures, including monitoring, enforcement, and interaction mitigation measures to ensure that continued utilization of sustainable fisheries in the western Pacific region *are not likely to jeopardize the continued existence of ESA listed species*") (emphasis added).

The Record establishes that NMFS enacted the June 2002 Regulations to appease its assumed substantive obligation under the ESA. Consequently, the dictates of the Magnuson–Stevens Act—other than the "any other applicable law" provision—did not factor into the agency's decision to promulgate the regulations. *See* 67 Fed. Reg. 40,232 (June 12, 2002). Likewise, West Pac did not consider these requirements under the Magnuson–Stevens Act when it reviewed the regulations. For example, in the May 20, 2002, recommended Regulatory Amendment, which included a Regulatory Impact Review and Final Regulatory Flexibility Analysis, West Pac considered five alternative actions, including the RPA from the 2001 BiOp.2002 Regulations AR–228, at 2908. However, West Pac considered these alternatives "theoretical." *Id.* Under the "No Action" alternative, West Pac hypothesized that, had the Council failed to implement the RPA, "NMFS would either implement the reasonable and prudent alternative of the BiOp via a unilateral Secretarial amendment to the FMP's regulations, or would close one or more FMP fisheries until it reached a decision on how to proceed." *Id.* In addition, under the section headed "Measures Taken to Minimize Impacts on Small Businesses," West Pac noted that

> the preferred alternative is the only alternative that meets the requirements of the Endangered Species Act, (without closing one or more fisheries) through implementation of the reasonable and prudent alternative contained in the March 29, 2001 Biological Opinion. All other alternatives were either rejected on the grounds that they would either not meet this legal requirement or they would close one or more fisheries. Specifically, Alternatives A, C, D, and E did not meet the legal requirements of the

Endangered Species Act Mandated Biological Opinion.

*Id.* at 2924. It appears clear, then, that West Pac committed to enacting, and NMFS promulgated, the regulations based solely on NMFS's assumed substantive obligation under the ESA. At no point did NMFS or West Pac consider the appropriate factors under the Magnuson–Stevens Act, other than the "other applicable law" provision.

Under arbitrary and capricious review, "[t]he court will overturn an agency's decision ... if ... the decision does not rely on the factors that Congress intended the agency to consider." *Sierra Club,* 295 F.3d at 1216 (citing *State Farm Ins.,* 463 U.S. at 43, 103 S.Ct. 2856). In this particular case, even assuming that the June 2002 Regulations did not "implement[ ] the reasonable and prudent alternative of the March 29, 2001, Biological Opinion," 67 Fed.Reg. 40,232 (June 12, 2002), NMFS would still have to articulate *some* valid reason for the continued application of the regulations under the Magnuson–Stevens Act, *Chenery Corp.,* 332 U.S. at 196, 67 S.Ct. 1575, based on "the factors that Congress intended the agency to consider," *Sierra Club,* 295 F.3d at 1216 (citing *State Farm Ins.,* 463 U.S. at 43, 103 S.Ct. 2856). Because Defendants have failed to do just that by not engaging in *any* analysis under the standards set out in the Magnuson–Stevens Act, even in the alternative, the Court concludes that Defendants' independent Magnuson–Stevens Act argument is unpersuasive.

### (3) *Defendants' 2002 BiOp Argument*

▮ In the alternative, Defendants argue that the 2002 BiOp provides an additional basis for upholding the June 2002 Regulations. Defs.' Mot., Sec. Claim at 16 ("Evening assuming for the sake of argument that it would have been improper to

allow the regulations to remain in place after the biological opinion was vacated, that situation was avoided in the present case by completion of the 2002 BiOp on the same date that the Court vacated the 2001 BiOp."); Defs.' Reply, Sec. Claim at 3, 4. According to Defendants, the 2002 BiOp provides "uninterrupted ESA coverage," because NMFS issued it on the same day that the Court vacated the 2001 BiOp. Defs.' Reply, Sec. Claim at 3. However, this argument runs counter to prevailing law, and therefore, it is no surprise that the Court cannot accept this rationale for upholding the June 2002 Regulations.[41]

In one of the Supreme Court's landmark administrative law cases, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court instructed that "review [of an agency action] is to be based on the full administrative record *that was before the Secretary at the time he made his decision.*" *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814 (emphasis added). Based largely on this standard, in *Mail Order Association v. United States Postal Service*, 2 F.3d 408, 434 (D.C.Cir.1993), the Court of Appeals for the District of Columbia Circuit explained that in "review[ing] ... an agency decision the record must be limited to *'that information before the agency at the time of its decision,*' thus excluding ex post supplementation of the record by either side.'" *Mail Order Ass'n*, 2 F.3d at 434 (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793

(D.C.Cir.1984)) (emphasis added, alterations and omissions in the original removed).

In this case, Defendants seek to use the 2002 BiOp, which was issued *after* the promulgation of the June 2002 Regulations, as a basis for upholding those regulations. *See* Defs.' Mot., Sec. Claim at 16; Defs.' Reply, Sec. Claim at 3, 4; Def.-Intervenors' Opp'n, Sec. Claim at 1, 8. The Court cannot accept this argument. Although the Administrative Record for the 2002 BiOp was filed in this case, that Record was not *"before the Secretary at the time he made his decision."* *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814 (emphasis added).

Even assuming, in the alternative, that Defendants could rely on the 2002 BiOp to provide "uninterrupted ESA coverage," Defs.' Reply, Sec. Claim at 3, Defendants' argument still fails. In order for Defendants to prevail, the 2002 BiOp must survive arbitrary and capricious review under the APA.[42] As the Court will demonstrate below, the 2002 BiOp is arbitrary and capricious and, therefore, cannot provide a valid legal basis for the continued application of the June 2002 Regulations. Thus, the Court rejects Defendants' final attempt at delineating a sound basis in law for upholding the June 2002 Regulations.

To summarize, Defendants and Defendant–Intervenors have offered no explanation for the continued legitimacy of the June 2002 Regulations.[43] Because the

---

41. Defendant–Intervenors appear to advance a similar argument—that is, they contend that the 2002 BiOp could provide the substantive foundation to support the June 2002 Regulations. *See* Def.-Intervenors' Opp'n, Sec. Claim at 1 ("Short of prevailing on its Third Claim for Relief, which HLA has yet to do, no basis exists for HLA to prevail on the Second Claim for Relief."); *see also id.* at 8. For the reasons set forth above, the Court is not persuaded by this argument.

42. Defendant–Intervenors appear to concede this fact: "Short of prevailing on its Third Claim for Relief, which HLA has yet to do, no basis exists for HLA to prevail on the Second Claim for Relief." Def.-Intervenors' Opp'n, Sec. Claim at 1.

43. It appears that no court has found itself in the unique circumstances of this case—that is, the Court was not able to find a single case where an RPA was invalidated, and yet, the

Court concludes (1) that the sole reliance of an unlawful BiOp RPA, without any independent analysis by the action agency, is arbitrary and capricious under the ESA; (2) that such an action is inconsistent with the Magnuson–Stevens Act and, in the alternative, that Defendants failed to engage in any analysis under the standards dictated by that statute; and (3) that the 2002 BiOp cannot provide an alternative source of "ESA coverage," the Court shall vacate and remand the June 2002 Regulations to NMFS.

### (B) Plaintiff's Third Claim for Relief: The 2002 BiOp

The 2002 BiOp rests on a major underlying assumption; whereas "[t]he 2001 BiOp analyzed the impacts of the Fishery as it existed prior to the injunctions in the *CMC* litigation," Defs.' Mot., Sec. Claim at 15, the 2002 BiOp considered "the management regime, as modified by adoption of the Reasonable and Prudent Alternative in the March 2001 Biological Opinion and described in the preferred alternative of the March 2001 FEIS by NMFS," 2002 BiOp AR–717, at 6018. This assumption renders the 2002 BiOp arbitrary and capricious, and the Court will vacate and remand it to NMFS, consistent with this finding.

The 2002 BiOp is subject to review under the arbitrary and capricious standard, as defined by the APA. *Sierra Club*, 295 F.3d at 1216; *see also Resources Limited,*

35 F.3d at 1304. In *Sierra Club*, the Court of Appeals for the District of Columbia Circuit further clarified the arbitrary and capricious standard:

> The court will overturn an agency's decision as arbitrary and capricious under "hard look" review if it suffers from one of the following: (1) the decision does not rely on factors that Congress intended the agency to consider; (2) *the agency failed entirely to consider an important aspect of the problem;* (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

*Id.* (citing *State Farm Ins.*, 463 U.S. at 43, 103 S.Ct. 2856) (emphasis added).

■ Applying the arbitrary and capricious standard of review in this case, the 2002 BiOp patently "failed ... to consider an important aspect of the problem"; it rested on the conclusions of the vacated and unlawful 2001 BiOp without reevaluating the merits of its analysis. In other words, rather than "revisiting the original analysis," 2002 BiOp AR–111, at 810, NMFS evaluated the effect that the Fishery's activities had on the listed turtles, operating under the time and area closures in the June 2002 Regulations, which implemented the 2001 BiOp's RPA, *see* 2002 BiOp AR–464, at 4070 ("The 'proposed action' would be the fisheries as they operate

---

action agency decided to maintain the regulations implementing that RPA. Nonetheless, the fact that this situation has yet to present itself to a court does not detract from this Court's holding. The decision announced by the Court is consistent with administrative law.

In addition, the Court observes that the results of this decision were largely dictated by Defendants' actions. After indicating that NMFS would reinitiate consultations, thereby *mooting* Plaintiff's claim, Defendants still im-

plemented the June 2002 Regulations. Had Defendants not made this representation—on the same day that their Opposition was due to Plaintiff's substantive challenge—the Court would have been in a position to review the merits of Plaintiff's claims prior to the expiration of the emergency interim rules. Instead, Defendants have advanced tactics that, whether deliberate or unintentional, have significantly delayed the resolution of Plaintiff's claims and unnecessarily complicated the litigation.

today.'"); *see also* 2002 BiOp AR–113, at 819 ("This is very different than sitting down with the data again and redoing our jeopardy analysis.").

Nonetheless, Defendants proffer several arguments as they attempt to shepard the 2002 BiOp from vacatur under arbitrary and capricious review. Defendants begin by simply maintaining that the Record supports the 2002 BiOp's conclusion.[44] Defs.' Mot., Third Claim at 24. Defendants rightly point out in their opening brief that Plaintiff bears the burden of demonstrating that the 2002 BiOp is arbitrary and capricious under the APA. *Id.* at 25. However, in Plaintiff's opening brief, it clearly establishes that the 2002 BiOp is, in fact, arbitrary and capricious because, like the June 2002 Regulations, its formulation rests on the conclusions of the unlawful and vacated 2001 BiOp. Pl.'s Mot., Third Claim at 20 ("At its simplest . . . , the flaw in NMFS' 2002 BiOp is that it continues to implement the substantive conclusions of the 2001 BiOp, which has been vacated.").

Defendants' argument also ignores the pre-determined nature of the 2002 BiOp's "no jeopardy" conclusion. After reviewing the effect that the Fishery has on the listed turtles operating under the time and area closures of the 2002 Regulations, which implemented the 2001 BiOp's RPA, the 2002 BiOp concluded by finding that the Fishery did not jeopardize the turtles. 2002 BiOp AR–717, at 6012, 6267–68. The Court does not consider this finding at all surprising; by design, the time and area closures of the 2001 BiOp's RPA were calculated to avoid jeopardizing the listed turtles. Indeed, the entire purpose of an RPA is to provide an alternative means to accomplish the proposed action without jeopardizing any endangered or threatened species.[45] *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402. Therefore, the 2002 BiOp was little more than an inquiry into the effectiveness of the 2001 BiOp's RPA, and it certainly did not "revisit[ ] the original analysis." 2002 BiOp AR–111, at 810.[46]

Defendants also contend that the action component of NMFS could validly restrict the scope of the 2002 BiOp to "the *fisheries as they operate today,*" 2002 BiOp AR–464, at 4070, by narrowly defining the action under review. Defs.' Opp'n, Third Claim at 6–8; *see also* Def.-Intervenors' Opp'n, Third Claim at 16–21. In support of this claim, Defendants note that under the Services' implementing regulations, the action agency is charged with defining the scope of the proposed action, and there-

---

44. Defendants also briefly raise the issue of standing, stating that "Defendants reserve the right to further address this issue." Defs.' Mot., Third Claim at 24. In its Opposition, Plaintiff allocates a large portion of its memorandum in an effort to stifle Defendants' potential standing argument. *See generally* Pl.'s Opp'n, Third Claim. Defendants do not raise the issue again, and because Plaintiff's standing appears beyond dispute, the Court will not address this matter any further.

45. In Plaintiff's Opposition to Defendants' Motion for a Stay, HLA noted that the new (2002) BiOp might be used as a means to "ratify [NMFS's] prior decisions." Pl.'s Opp'n, Mot. for Stay at 10. In response, Defendants claimed: "There is no basis upon which to determine what the outcome of the new section 7 process will be." Defs.' Reply, Mot. for Stay at 4. As the Court has demonstrated, Defendants directly contradicted their own representations to the Court when they restricted the scope of the 2002 BiOp.

46. As a result of the 2002 BiOp's "no jeopardy" finding, NMFS was not required to initiate a new set of RPAs. Accordingly, NMFS was also not required to consult with HLA as an "applicant"—at least, regarding the issue of promulgating a new set of RPAs. Instead, the 2002 BiOp issued a revised series of Incident Take Statement Levels. *2002 BiOp AR–717, at 6328–30.*

fore, may limit the scope of the biological opinion assessing that action. Defs.' Opp'n, Third Claim at 6 (citing 50 C.F.R. § 402.14(c)(1)). However, Defendants' argument does not avoid the underlying defect of the 2002 BiOp—which is that it is based on the unlawful conclusions of the 2001 BiOp. Regardless of whether or not the action component of NMFS could limit the scope of the 2002 BiOp by redefining the action under review, at no point has NMFS lawfully determined that the Fishery, as it operated prior to the time and area closures, jeopardized the listed turtles.

Even assuming that Defendants' argument avoided this trap, the altered scope of the 2002 BiOp appears contrary to law and is certainly not consistent with the representations Defendants made to this Court. In a case that is procedurally similar to the present action, the United States District Court for the Western District of Washington held that "an action agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the agency action at issue in a biological opinion." *Greenpeace v. NMFS*, 80 F.Supp.2d 1137, 1146 (W.D.Wash.2000) (relying on *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir.1994)). In *Greenpeace*, the plaintiffs filed suit challenging the adequacy of two biological opinions under the ESA. *Id.* at 1141. In response, NMFS pursued a strikingly similar litigation strategy to that of the present case. Faced with the plaintiffs' pending motion for summary judgment, "NMFS moved for a stay of the litigation." *Id.* at 1142. NMFS informed the *Greenpeace* court that "it was consulting on a biological opinion pursuant to section 7 of the ESA that would 'examine all Federally-managed fisheries' ..., including all 'issues that will be addressed in the [Supplemental Environmental Impact Statement (SEIS)].'" *Id.* (quoting defen-

dant's memorandum in support of a stay). "NMFS argued that a stay of [the *Greenpeace*] litigation was proper because the new 'biological opinions and SEIS [would] supersede and make moot the biological opinions and environmental assessment that [were] the subject of plaintiffs' complaint.'" *Id.* (quoting defendants' memorandum in support of a stay). The *Greenpeace* court concluded that if it "continued ... with the pending motion for summary judgment or any other action in connection with the pending litigation ..., it would be largely, if not entirely, an academic exercise." *Id.* (internal quotation marks omitted). Therefore, the court granted defendants' motion for a stay. *Id.*

Following the court's decision, "NMFS issued the promised documents: a Supplemental Environmental Impact Statement" and two biological opinions. *Id.* "Plaintiffs amended their complaint to challenge the sufficiency of these documents under NEPA and the ESA." *Id.* In a prior decision, the court considered the sufficiency of the plaintiffs' NEPA claim and their challenge of one of the two biological opinions under review. *Id.* at 1142–43. Therefore, the *Greenpeace* court considered the validity of the remaining, reinitiated biological opinion. Surprisingly, given the complicated nature of the present action, this Court also finds itself in largely the same position—a second round of cross-motions for summary judgment. *See id.* at 1143.

The *Greenpeace* plaintiffs asserted that the newly promulgated biological opinion was insufficient because "NMFS ... failed to prepare a biological opinion that [was] adequate in scope." *Id.* Specifically, the biological opinion was "limited in scope to the authorization of the 1999 fishery as opposed to the entire groundfish management plans." *Id.* at 1146. The court determined that "NMFS must

prepare a biological opinion equal in scope to the FMPs." *Id.* at 1144. The court then went on to consider whether NMFS could narrow the scope of the proposed action to mirror the narrowed scope of the new biological opinion. According to the intervenor-defendants, the new biological opinion adequately considered a temporal portion of the proposed action, the 1999 fishery, and prior biological opinions "addressed the impacts of the FMPs in their entirety." *Id.* at 1145. In this way, the intervenor-defendants argued that NMFS could narrow the scope of the proposed action and use prior biological opinions to fill in the temporal gaps. *See id.* The court rejected this argument:

> The fact that BiOp2 is limited by its own terms to the authorization of the 1999 fishery is not dispositive of its proper scope. Ultimately, the meaning of "agency action" is determined as a matter of law by the Court, not by the agency. *Pacific Rivers Council,* 30 F.3d at 1054 (the courts, not the agency, are charged with the basic responsibility of defining "agency action" subject to consultation). Thus, an agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the agency action at issue in a biological opinion.

*Id.* at 1146. In fact, the court observed:

> To accept the [intervenor defendants'] position would, in fairness, require this Court to revive plaintiffs' claims against the ... previously challenged [biological opinions], effectively returning this case to a point in the litigation now long since passed. In the process, the Court would have permitted NMFS to manipulate these proceedings and evade judicial review of its fishery management practices by the simple device of failing to live up to the representations it made in open court.

*Id.* The court also debunked another major assumption of the intervenor-defendants' argument: NMFS could not rely on the previous biological opinions to fill in the temporal gap left behind by the narrowly prescribed, new biological opinion because of the representations NMFS made to the court—namely, that the new biological opinion would be "a broad and comprehensive analysis." *Id.* In the alternative, the court determined that the prior biological opinions had since expired and were "no longer legally sufficient"; therefore, NMFS could not rely on them to fill the temporal gaps created by the newly issued biological opinion even in the event that its prior representations did not render them invalid. *Id.*

Finally, the *Greenpeace* court considered the government-defendants' argument, which asserted that the new biological opinion was not narrow in scope but adequately addressed "the entire fishery management regime." *Id.* at 1147 (quotations omitted). The court also rejected this argument—and similar to the decision in this case—held that "a biological opinion which does not address the full scope of the agency action is arbitrary and capricious because it necessarily fails to consider important aspects of the problem." *Id.* at 1147.

Defendants in the present litigation seek to distinguish *Greenpeace* on its facts. Specifically, Defendants contend that the court was "considering whether a given action was an 'action' for purposes of section 7, thus requiring consultation.... [The court did not] purport to usurp the agency's discretion to identify and describe the action upon which consultation would occur." Defs.' Opp'n, Third Claim at 6 n. 1. The Court, however, disagrees with Defendants' characterization of the *Greenpeace* decision.[47] As that court clearly stated:

---

**47.** Defendant–Intervenors also seek to distin-  guish *Greenpeace,* albeit on different grounds.

"[A]n action agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the *agency action* at issue in a biological opinion." *Greenpeace v. NMFS*, 80 F.Supp.2d at 1146 (emphasis added). In fact, the *Greenpeace* court had already dispensed with the question of "whether a given action was an 'action' for purposes of section 7," Defs.' Opp'n, Third Claim at 6 n. 1, in a prior section of the opinion. *Compare Greenpeace*, 80 F.Supp.2d at 1144–45 (considering whether an FMP constitutes an agency action) *with id.* at 1145–46 (considering whether NMFS could narrow the action under review based on temporal distinctions). Nonetheless, even if Defendants' characterization was accurate, the Court does not find this distinction relevant to the question before it. As the Court has already determined, the 2001 BiOp's conclusions cannot be used as a baseline for the analysis in the 2002 BiOp. Indeed, the action component of NMFS cannot abrogate its responsibility under the ESA by narrowing the action under review, which in turn is premised on the conclusions of the unlawful and invalid 2001 BiOp.

In another striking similarity to the *Greenpeace* litigation, Defendants failed to live up to the representations they made to this Court. When Defendants petitioned this Court for a partial dismissal or, in the alternative, a stay of these proceedings, they indicated that

new information [was] available which [would likely] improve NMFS' ability to quantify and evaluate the effects of the United States' pelagic fisheries and the reasonable and prudent alternatives in the BiOp on listed turtle populations. Therefore, ... NMFS [decided to reinitiate] *"section 7 consultation under the Endangered Species Act (ESA) on the potential effects of the pelagic fisheries under the FMP on threatened and endangered species."*

Defs.' Mot. for Stay, Ex. A, at 1 (emphasis added) (*also available at* 2002 BiOp AR–114, at 821). Defendants also noted that "observer data since 1999 is available which [would likely] affect the estimated direct and indirect effects of the fisheries and the expected results of the reasonable and prudent alternative." *Id.* Therefore, Defendants argued that the "2001 BiOp now has limited continuing applicability and any declaratory judgment would be strictly advisory with respect to the new consultation and the forthcoming [2002] BiOp." Defs.' Mot. for Stay at 7; *see also* Defs.' Reply, Mot. for Stay at 2 (stating that "the 2001 BiOp has limited continuing applicability and will soon be *superceded* ") (emphasis added); *id.* at 3 (arguing that "the imminent issuance of a new biological opinion *renders litigation and judicial analysis of the 2001 BiOp imprudent* ") (emphasis added).[48]

Def.-Intervenors' Opp'n, Third Claim at 21. According to Defendant–Intervenors, the present case is distinguishable from *Greenpeace* because, independent of Defendants' representations to this Court, nothing "suggests that the 2002 BiOp or the process that resulted in it are unlawful." *Id.* The Court rejects this argument. Independent of Defendants' representations to the Court, the 2002 BiOp is arbitrary and capricious because it never reevaluated the 2001 BiOp's jeopardy conclusion. Without a valid, science-based decision determining that the Fishery's for-

mer activities jeopardized the listed turtles, NMFS is not free to pretend that the conclusions in a vacated biological opinion still stand and then issue a new biological opinion that does not reconsider those matters. As the Court has already determined, the 2002 BiOp patently failed to consider an important aspect of the problem; it is therefore unlawful under the APA.

**48.** *See also supra* note 45.

Defendants concede that, at least until the spring of 2002, "NMFS prepared a draft opinion based on the fishery as it was operating in 1999." Defs.' Response to Pl.'s Statement, Third Claim ¶ 51; *see also* Pl.'s Statement of Facts, Third Claim ¶ 51. In an October 9, 2002, memorandum, however, the action component of NMFS formally requested that the scope of consultation be limited to the "fisheries as they operate today." 2002 BiOp AR–464, at 4070. Apparently, between the spring of 2002 and October 9, 2002, "there was some debate as to whether the proposed action for the purposes of consultation should be the unrestricted fishery as it existed prior to the injunction in the *CMC* litigation and the 2001 BiOp RPA, or the restricted fishery as it had been operating ... for more than two years." Defs.' Mot., Third Claim at 15 (italics added). By April of 2002, Defendants state that "given the passage of time and unfolding events consulting on the fisheries as they existed prior to the date of the *CMC* litigation [would] come[ ] across as artificial and contrived." *Id.* (internal quotations omitted). Moreover, according to Defendants, "the newer data used in consultation related to the present fishery, to the pre–1999 fishery, and therefore a disconnect [would] result[ ]." *Id.* (internal quotations omitted).

Perhaps it would have been easier for NMFS to consider the effect of the Fishery, as it existed under the time and area closures imposed by the June 2002 Regulations, which were in turn based on the unlawful 2001 BiOp; however, NMFS indicated to the Court that the 2002 BiOp would render the 2001 BiOp *moot.*[49] *See* Defs.' Mot. for Stay at 6–7. Following these representations, NMFS issued the 2002 BiOp, which analyzed the Fishery as it operates today, and did not revisit the 2001 BiOp's prior conclusions. The Court cannot accept Defendants' argument; to do so would effectively require the Court to revisit the 2001 BiOp after Defendants asserted that their decision to reinitiate consultations rendered it moot. Moreover, such a course would be impossible because the Court has already vacated and remanded the 2001 BiOp to NMFS. As the *Greenpeace* court observed:

> To accept [Defendants'] position would, in fairness, require this Court to revive [Plaintiff's] claims against the ... previously challenged [biological opinion], ef-

**49.** Defendant–Intervenors argue that NMFS's actions were entirely consistent with its representations to the Court. Def.-Intervenors' Opp'n, Third Claim at 17–18. In essence, the Conservation Groups contend that NMFS represented to the Court that the 2002 BiOp would consider the impact of the Fishery operating under the Pelagics FMP. *Id.* at 18. Because the Pelagics FMP was amended when the June 2002 Regulations were promulgated, Defendant–Intervenors contend that the 2002 BiOp could consider the effects of the June 2002 Regulations in a manner consistent with NMFS's representations to the Court. *Id.* In other words, technically speaking, NMFS did consider the Fishery's impact on the listed turtles under the Pelagics FMP— the FMP just happened to have been altered by the 2001 BiOp. The Court is not persuaded by Defendant–Intervenors' arguments. First, like Defendants, Defendant–Intervenors fatal- ly contend that an action that is vacated and declared unlawful on procedural grounds somehow still creates substantive legal obligations under the ESA. Second, their arguments fail to ascribe any legal role to a biological opinion issued by the Services. Under Defendant–Intervenors' argument, in one biological opinion NMFS could render a jeopardy decision, and then *after that decision* was vacated by a district court, NMFS could nonetheless pretend that the prior biological opinion still validly declared that the action under review jeopardized listed species without revisiting its original analysis. Finally, Defendant–Intervenors' argument would vitiate the ESA's procedural and best science guarantees. Under their argument, the Services could offend the procedural rights of parties under the ESA and, nevertheless, circumvent these rights by changing the scope of the reinitiated biological opinion.

fectively returning this case to a point in the litigation now long since passed. In the process, the Court would have permitted NMFS to manipulate these proceedings and evade judicial review of its fishery management practices by the simple device of failing to live up to the representations it made in open court. *Greenpeace*, 80 F.Supp.2d at 1145.

Moreover, the Court cannot accept Defendants' argument that it was simply more convenient to review recent data. When NMFS indicated that it would reinitiate consultations, it noted that "observer data since 1999 is available which [would likely] affect the estimated direct and indirect effects of the fisheries and the expected results of the reasonable and prudent alternative." Defs.' Mot. for Stay, Ex. A, at 1 (*also available at* 2002 BiOp AR–114, at 821). Some five months later, in April 2002, NMFS determined that "given the passage of time and unfolding events consulting on the fisheries as they existed prior to the date of the *CMC* litigation [would] come[ ] across as artificial and contrived." Defs.' Mot., Third Claim at 15 (internal quotations omitted). Again, the Court finds the decision in *Greenpeace* instructive. There, faced with a similar argument by NMFS, the court indicated that "[a] federal agency . . . is not excused from fulfilling the dictates of the ESA if, in its judgment, there is insufficient information available to complete a comprehensive opinion and it takes upon itself a more

limited analysis." *Greenpeace*, 80 F.Supp.2d at 1150 (internal brackets and quotations in the original omitted) (quoting *Conner v. Burford*, 848 F.2d 1441, 1455 (9th Cir.1988)). The Court can only conclude that NMFS's decision was arbitrary and capricious: The agency restricted the action under consultation to the fisheries as they operated under the time and area closures of the June 2002 Regulations, which were based on the conclusions of the unlawful 2001 BiOp. Therefore, the Court shall vacate and remand the 2002 BiOp consistent with the Order accompanying this opinion.[50]

## IV. CONCLUSION

In some respects, this case can be distilled to one discrete issue: After violating Plaintiff's procedural rights, can Defendants continue to rely on the substantive conclusions of a vacated BiOp? The Court has determined that Defendants cannot. To reach a contrary holding would be to allow Defendants to flout the procedural rights of Plaintiff, circumvent judicial review, and ignore some of the most basic tenets of administrative law.

For the reasons stated above, the Court shall grant Plaintiff's motions for partial summary judgment and deny Defendants' cross-motions. In reaching this conclusion, the Court has considered all other arguments raised by the parties and finds no need to address them in this opinion.

---

**50.** Plaintiff argues that the Court should reach other alleged substantive deficiencies with the 2002 BiOp (for example, the science employed—or not employed—in reaching its conclusion) in order to give "NMFS specific judicial direction on what is lawful and what is not." Pl.'s Mot., Third Claim at 20. The Court sympathizes with Plaintiff over the position it now finds itself in: After enduring nearly two and one half years of protracted litigation, the parties are now back to square one. Nonetheless, the Court concludes that the 2002 BiOp's reliance on the 2001 BiOp's conclusions, without reevaluating the merits of those conclusions, would make it impossible to review the other deficiencies that purportedly pervade the 2002 BiOp's analysis. More importantly, such an opinion would be advisory in nature and overstep the Court's authority. The validity of any future determinations issued by NMFS, if adverse to Plaintiff, would quite naturally be grounds for a new, and separate, suit.

The June 2002 Regulations, 67 Fed.Reg. 40,232 (June 12, 2002), and the 2002 BiOp, affecting the Western Pacific Pelagics FMP and issued on November 15, 2002, shall be vacated and remanded to NMFS consistent with the Order accompanying this Memorandum Opinion. "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *County of Los Angeles v. Shalala,* 192 F.3d 1005, 1011 (D.C.Cir.1999) (quoting *PPG Indus., Inc. v. United States,* 52 F.3d 363, 365 (D.C.Cir.1995)). Accordingly, it is up to the agency to determine how to proceed next—not for the Court to decide or monitor. *See id.* What is clear, however, is that the 2001 BiOp, the June 2002 Regulations, and the 2002 BiOp have all been vacated and remanded to NMFS.